UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| | : | |
| NEAL WAANANEN | : | CIVIL NO.  3:02CV2307(JBA) |
| *Plaintiff*, | | |
| | : | |
| v. | : | |
| | : | |
| TIMOTHY BARRY, | : | |
| EDWARD LYNCH, | : | |
| JOHN REARICK and | : | |
| SUE KUMRO | : | |
| *Defendants*. | : | February 27, 2004 |

## MEMORANDUM IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

I.     **INTRODUCTION**

        The Plaintiff,  Neal A. Waananen, ("Waananen" or "plaintiff") is a current employee of

the Connecticut State Police ("CSP"), a sub-division of the Department of Public Safety

("DPS").  Plaintiff has brought the present civil rights action against four employees of CSP

concerning an incident that occurred on January 31, 2000, in which plaintiff became embroiled

in a domestic dispute with his former wife (Rosanne Waananen) and former friend (John

McGunigle), and barricaded himself in his home with his young son, Erik Waananen.

        As set forth in this motion, the CSP officials involved in this case, including the

defendants, acted reasonably based on the available information about the exigent circumstances

they faced.  Plaintiff's § 1983 action alleging Fourteenth Amendment due process and Fourth

Amendment search and seizure violations should be dismissed as against the defendants Timothy

Barry (at the time Lieutenant Colonel, Commander CSP Field Operations), Edward Lynch

(Major, CSP Western District Commander ), John Rearick (Major, CSP Eastern District

Commander), Sue Kumro (Master Sergeant, Commanding Officer, Employee Assistance

Program).  Defendants Lynch, Rearick, and Kumro had no personal involvement in plaintiff's

claims.  Plaintiff cannot prove a violation of either Fourteenth or Fourth Amendment rights since

he voluntarily consented to the entry and search in his home and the subsequent mental

examination he underwent.  Ultimately, the defendants' actions were objectively reasonable and

the present action is barred by qualified immunity.

## II.    **FACTS**

Without reiterating all of the facts in the defendants' Rule 56(a) Statement, the following

are essential.  The plaintiff was first hired by CSP on November 15, 1982 as a Trooper Trainee,

and progressed to the Trooper position.  On June 4, 1999, Waananen was promoted to Master

Sergeant and assigned to Troop D, located in Danielson, Connecticut.  In January of 2000, the

plaintiff resided with his wife Rosanne Waananen and their two children Kurt (then 11 years old)

and Audrey (then 6 years old), in their home at 3 Pilgrim Circle in Enfield, Connecticut.  (Facts,

¶¶ 1-4 ).

On January 31, 2000, a CSP employee, Trooper James Tilley telephoned Master Sergeant

Sue Kumro ("Kumro")(the commanding officer of the CSP Employee Assistance Program, who

at that time, was in Middletown, Connecticut attending a wake for a deceased police officer), that

there was a serious problem concerning Waananen.  Tilley told Kumro that a mutual friend of his

and Waananen, named John McGunnigle, urgently contacted him to report that the plaintiff was

embroiled in a domestic dispute at his home on Pilgrim Circle in Enfield Connecticut.  Tilley

told Kumro that plaintiff and his wife Rosanne Waananen had a serious argument in which

McGunnigle had attempted to intercede. Mr. McGunigle was invited into the home by Rosanne

Waananen. (Facts ¶¶ 20, 23-26).  In front of his children, the plaintiff physically grabbed

McGunnigle and "threw" him out of the house. (Facts, ¶ 58). At that point Rosanne Waananen and her children attempted to flee the house out the front door onto the snow covered ground in their stocking feet.  (Facts ¶¶ 21, 58 ). Plaintiff ordered his children to return into the house; Audrey continued running down the street, Erik stopped and came back into the house.  After Erik came back into the house, Waananen locked all the doors denying his wife and McGunigle access to the house.  Rosanne Waananen and McGunigle tried to open the kitchen door with a key; Waananen pushed the door shut and repeatedly re-locked the door.  After this continued a number of times, Waananen pushed the refrigerator to block the door with the intent to keep his wife and McGunigle out of the house.  By blocking the kitchen door, Rosanne Waananen and McGunigle became even more alarmed and fearful about what Waananen might do.  They especially concerned about the safety of Erik.  (Facts, ¶¶ 21-23).

Upon receiving Tilley's description of this information he had received from McGunigle, Kumro immediately tried, repeatedly, to reach Waananen by telephone.  Kumro was unsuccessful in contacting Waananen since he had disconnected the house telephone.[1]  (Facts, ¶ 27).  With the knowledge that Waananen had reportedly barricaded himself in his house with a child, and was reportedly acting erratically in the context of a marital dispute, Kumro reasonably believed that it was her duty to report the matter to her superiors.  She thereupon spoke directly with a superior officer, defendant Major Edward Lynch, who was present in Middletown, and explained the circumstances as she understood it from information supplied to her from Trooper Tilley.(Facts, ¶ 28).

---

[1] Waananen had first disconnected his telephone to stop the repeated calls made by his wife and McGunigle to reach him.  After this, he later used the telephone line to access the internet.  (Facts, ¶¶  27, 37).  As the events unfolded, Waananen's disconnecting his telephone, intensified the sense of urgency by CSP officials.

Major Lynch immediately contacted other CSP employees and officials, including his superior, Lieutenant Colonel Timothy Barry (who was in charge of all CSP field operations) to respond to the incident based on all of the available information at his disposal.   The Enfield Police Department also responded to the scene.  As part of this response, Lieutenant Colonel Barry directed that the CSP emergency response team and hostage negotiator respond to a location in close vicinity to plaintiff's home in Enfield.  This precaution was taken since the Enfield Police Department did not have an emergency response team.  The DPS tactical response team deployed a few blocks away (neither visible to or in the immediate vicinity of Pilgrim Circle).  (Facts, ¶ 31, 33).

The CSP officials present tried to contact the plaintiff on his home telephone, but like Kumro, were unsuccessful since plaintiff had disconnected his telephone.  Plaintiff's supervisor, Lieutenant Thomas Davoren, who had been called to the scene, then had Waananen paged through Troop D headquarters.  Although there was some delay in reaching plaintiff, Lieutenant Davoren was able to communicate with the plaintiff after plaintiff responded to the page. Lieutenant Davoren asked plaintiff if he and another CSP employees could come and speak with him at his home.  (Facts, ¶ 37).

Knowing full well that Lieutenant Davoren was present due to the conflict with his wife, the plaintiff consented to this request, since as plaintiff described it, "he [plaintiff] knew the drill" in which he understood "there's been times that I've had to go over trooper's houses when there allegations of marital discord, and [I] had to go over there just to make sure everything is okay, and I knew that was what he [Davoren] had to do *as my superior*, he had to come over there just to make sure everything was all right." (Facts, ¶ 38)(emphasis added).[2]

---

[2] A relevant feature in this case was the existence of the employer-employee relationship coupled with plaintiff's occupation as a police officer with full police powers including the authority to use weapons in his job.

Prior to approaching the house, upon suggestion from his superior Major Rearick, and reflecting the uncertainty of the circumstances, Lieutenant Davoren put on a protective vest under his jacket.  Additionally, prior to approaching the house, Waananen's wife Rosanne gave Lieutenant Smith a key to the house and a description of its layout thus giving clear consent to their entry into the house.  (Facts, ¶ 35).

Lieutenant Davoren, accompanied by Lieutenant Smith, went to the front door and plaintiff voluntarily permitted them to enter the kitchen area of the house ("Come on in"). (Facts, ¶¶ 37, 39).  Lieutenants Davoren and Smith went inside Waananen's home in the kitchen area and  were assured of the whereabouts and safety of Waananen's son Erik.  They also asked Waananen about the presence of firearms in the house.  In response to their inquiries, plaintiff voluntarily produced his duty firearm. (Facts, ¶ 41).

Plaintiff then voluntarily went outside with Lieutenants Davoren and Smith, a discussion was held with plaintiff, Davoren, Smith, and Lieutenant Colonel Barry and Major Rearick.  Upon Lieutenant Colonel Barry's direction, plaintiff agreed to undergo a mental examination for the stated reasons to insure that he was not a danger to himself or others.  Plaintiff did not object to going to the hospital.  Plaintiff was driven to the hospital by Lieutenant Davoren.  Prior to reaching the hospital, plaintiff voluntarily disclosed that he had overlooked the fact that he also had a 22 rifle in the house.  Lieutenant Smith later secured the rifle for safe keeping without objection by Waananen.  (Facts, ¶¶ 42- 46).

Lieutenant Davoren transported Waananen to Hartford Hospital and was examined by medical providers who determined that plaintiff was not a danger to himself or others, but that there should be "follow up with EAP." (Facts, ¶¶ 47, 48).  Plaintiff then agreed with Lieutenant Davoren and with Kumro, who was also present, that it was not feasible for plaintiff to return to

his home that evening.  Plaintiff himself decided to stay at a motel near his home.  Lieutenant

Davoren transported plaintiff to the motel suggested by plaintiff. (Fact, ¶ 49).  Although the

Enfield Police Department completed a written summary of the incident, CSP did not do so since

it was unaware that the plaintiff had violated any department rule or policy (Waananen did not

disclose that he had assaulted McGunigle). (Facts, ¶¶ 51-53).

        As advised by Hartford Hospital that he follow-up through the employee assistance

program, plaintiff subsequently underwent psychotherapy treatment through an EAP referral

with  Psychologist, Dr. Kenneth A. Colby, from February 2000 until completing treatment on

April 19, 2000.  Notably, Dr. Colby diagnosed Waananen as suffering from "adjustment disorder

with mixed anxiety and depressed mood."  His initial intake and assessment records, disclosed

by plaintiff in discovery, reveals that Dr. Colby found Waananen as having "severe" functional

impairments in the area of "job," and "relationships."  Dr. Colby's treatment notes, reflect his

observation that Waananen was an "angry, controlling man, with a rigid personality" who was in

a "combative" relationship with his wife. (Facts, ¶¶ 54, 55).

        In March of 2000, Waananen filed for divorce from his wife.  In November of 2001, a

divorce judgment was issued, however, his former wife Rosanne Waananen was granted sole

custody of the two children from the marriage. (Facts, ¶ 56).

        On December 24, 2002, the plaintiff filed the present action against the individual

defendants Timothy Barry, Edward Lynch, John Rearick, and Sue Kumro.

        Plaintiff's complaint against the defendants, in their individual capacities, is brought

under 42 U.S.C. § 1983 alleging that the defendants' actions (1) violated his right to procedural

due process under the Fourteenth Amendment, (2) violated his Fourth Amendment right to be

free from unreasonable and warrantless search and seizure of his residence, person and effects,

and (3) violated his Fourteenth Amendment substantive due process rights in that the defendants'
actions were "shocking to the conscience."

The Defendants move for Summary Judgment on the following grounds:

(a)     There is no personal involvement by the named individual defendants to
        substantiate the factual allegations underlying plaintiff's Fourteenth and Fourth
        Amendment claims;

(b)     The plaintiff cannot prove that his right to procedural due process was violated;

(c)     Plaintiff cannot establish that his substantive due process rights was violated;

(d)     Plaintiff cannot establish or prove that defendants violated his Fourth Amendment
        right against unreasonable search and seizure;

(e)     Plaintiff's claims against all defendants, in their individual capacities, are barred
        by the doctrine of qualified immunity.

The defendants incorporate by reference their Local Rule 56 (a) Statement of Facts.

## III.     SUMMARY JUDGMENT STANDARD

"[S]ummary judgment allows the court to dispose of meritless claims before
becoming entrenched in a frivolous and costly trial." Donahue v. Windsor Locks Board of Fire
Commissioners, 834 F.2d 54, 58 (2d Cir. 1987).  Rule 56 of the Federal Rules of Civil Procedure
provides that summary judgment shall be rendered when a review of the record demonstrates
"that there is no genuine issue as to any material fact and that the moving party is entitled to a
judgment as a matter of law."

"In moving for summary judgment against a party who will bear the ultimate burden of
proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to
support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth
Defects Foundation, 51 F.3d 14, 18 (2d Cir. 1995). Once that burden is met, the non-moving

party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). A party may not rely upon mere allegations or denials in his pleading, but rather must set forth specific facts showing that there is a genuine issue remaining for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). As the Supreme Court has made clear, the Court must evaluate the defendant's motion for summary judgment according to the plaintiff's ultimate burden of proof. Anderson, 477 U.S. at 252; Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

## IV.    LAW AND ARGUMENT

### A.    THE PLAINTIFF'S CLAIM AGAINST THE INDIVIDUAL DEFENDANTS SHOULD BE DISMISSED SINCE THEY HAD NO PERSONAL INVOLVEMENT IN THE ALLEGED CONSTITUTIONAL VIOLATIONS

As a preliminary consideration, plaintiff's claims against the individual defendants stemming from the incident on January 31, 2000 fails since defendants Edward Lynch, John Rearick, and Sue Kumro had no personal involvement in the alleged search and seizure claim, and the decision that the plaintiff undergo a mental examination. Additionally, defendant Barry had no direct involvement in entering plaintiff's home or conducting a search in that location.

Under § 1983, a defendant's "personal involvement" in an alleged deprivation of constitutional rights is a prerequisite to an award of damages. See, e.g., Gill v. Mooney, 824 F.2d 192, 196 (2d Cir. 1987); Alfara Motors, Inc. v. Ward, 814 F.2d 883, 886 (2d Cir. 1987). A defendant may be personally involved in a constitutional deprivation within the meaning of 42 U.S.C. § 1983, when he or she has directly participated in the infraction. Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986)(emphasis added). A plaintiff must thus allege a tangible

connection between the acts of the defendant and the injuries suffered.  Bass v. Jackson, 790

F.2d 260, 263 (2d Cir.1986).

The defendants remind the court that the plaintiff must prove a constitutional violation

against each individual defendant. The State of Connecticut Department of Public Safety is NOT

a defendant. Accordingly, the burden is upon the plaintiff to show how each defendant was

personally involved in a constitutional violation sufficient to impose liability.

The undisputed evidence shows that defendant Edward Lynch was in Middletown

conducting a heavily-attended wake for a deceased police officer.  Plaintiff's claim against

defendant Lynch is that he was involved in the "chain of information" regarding the incident

occurring at plaintiff's home in Enfield and should have taken steps to investigate the matter

rather than trusting the information he received. (Facts ¶ 60).  Given the information supplied to

defendant Lynch by defendant Kumro, plaintiff's claim is frivolous.  Ultimately, defendant

Lynch cannot be held liable for any of plaintiff's claims because he had no involvement in the

actual events at plaintiff's home later that evening including the alleged "search and seizure."

(Facts, ¶¶ 24, 28-30).[3]

So too with defendant Sue Kumro, who at the time of the incident was in charge of the

CSP employee assistance program which provides services for agency personnel regarding

personal and other problems.   According to plaintiff, defendant Kumro is liable because she also

was in the "chain of events" and "failed to do her job" by accepting Tilley's representations on

face value and passed this "confidential" information (according to plaintiff) on to CSP. (Facts ¶

59).  This claim is patently frivolous.  There is no basis in law or fact for plaintiff to claim that

Tilley's call to Kumro was "confidential," especially when the urgent question of a child's safety

was at stake.   After plaintiff had disconnected his telephone, first to cut off his wife's access to him, and later because he used that telephone line for internet access to look at dog pictures with his son, Kumro repeatedly tried, in vain, to reach Waananen to talk directly with him about the apparent problem brought to her attention by Trooper Tilley.  Plaintiff admits that he had no idea that Kumro was trying to reach him.  Of course this is obvious because, as noted, plaintiff had disconnected his telephone so that no one could reach him by telephone.  (Facts, ¶¶ 25-29).  Ultimately, defendant Kumro had no involvement in any of the acts supporting plaintiff's search and seizure claim.  Plaintiff's claim against defendant Kumro is patently frivolous and should be dismissed.  (Facts ¶ 59).

With regard to defendant John Rearick, except for the fact that he was Lieutenant Davoren's superior and was present outside plaintiff's home on the evening of January 31, 2000, it is unclear how he fits into plaintiff's theory of his case.  Simply put, plaintiff has absolutely no evidence of direct involvement by defendant Rearick in any of the alleged misdeeds that plaintiff complains of.  Plaintiff admits that defendant Rearick did not come into his home, he did not "search" his home, and plaintiff has no evidence that he was involved in the decision to require plaintiff to undergo a mental examination.  (Facts ¶ 61).

The only remaining defendant, then Lieutenant Colonel Barry, made the decision that plaintiff undergo a mental examination.  This decision was reasonable and plaintiff's claim in this regard should be dismissed as discussed below.  However, with regard to his claim against defendant Barry for an unlawful  "search and seizure,"  plaintiff has no evidence that defendant Barry entered or searched his home.  (Fact ¶ 62).  It is irrefutable that he had no direct personal involvement.  (Facts, ¶¶ 42-44).

---

[3] As argued, <u>infra,</u> plaintiff consented to Lieutenants Davoren and Smith entering his home, and volunteered information regarding the whereabouts of his firearms, thus there was no "search and seizure" in this aspect of the

From the foregoing, the noteworthy fact is that Lieutenants Davoren and Smith, who plaintiff has NOT sued in this case, were the parties who entered plaintiff's home and secured plaintiff's firearms. Later, Lieutenant Davoren was the CSP official who took plaintiff to the hospital and later to the motel chosen by plaintiff. By plaintiff's open acknowledgment, however, plaintiff trusted his boss, Lieutenant Davoren, but it was he who told plaintiff that he could not return to his residence that night, and ***not,*** any of the named defendants. (Facts, ¶ 49).

In summary, plaintiff's claims against defendants Lynch, Rearick, and Kumro must fail since they had no direct personal involvement in any of the alleged constitutional claims in the complaint. Further, except for plaintiff's claim against defendant Barry regarding the decision that Waananen undergo a mental examination (discussed below), there are no other issues of material fact regarding his direct involvement in any other legal issue.

**B.     THE PLAINTIFF' HAS NOT ALLEGED NOR CAN HE PROVE THAT THE DEFENDANTS VIOLATED HIS FOURTEENTH AMENDMENT PROCEDURAL OR SUBTANTIVE DUE PROCESS RIGHTS**

In his complaint, the plaintiff alleges that the defendants denied the plaintiff's "right to procedural due process in violation of the Fourteenth Amendment.. . ." (Complaint, ¶ 15). Plaintiff's procedural due process and substantive due process claims are meritless. The due process claim(s) alleged against the defendants must fail because the plaintiff not only fails to state a cause of action, but the plaintiff's allegations do not rise to the level of a substantive or procedural due process violation.

**1.     Substantive Due Process**

The Due Process Clause of the Fourteenth Amendment provides "a guarantee of fair procedure in connection with any deprivation of life, liberty, or property by a State." The

---

case.

substantive component of the Clause "protects individual liberty against 'certain governmental actions regardless of the fairness of the procedures used to implement them.'" Collins v. City of Harker Heights, Texas, 503 U.S. 115, 112 S. Ct. 1061, 1068, 117 L. Ed.2d 261 (1992).

The United States Supreme Court has interpreted the Fourteenth Amendment's substantive due process component to forbid the government from infringing "certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." Reno v. Flores, 507 U.S. 292, 113 S. Ct. 1439, 1447, 123 L. Ed.2d 1 (1993). A state violates due process when its action " 'afford[s] those canons of decency and fairness which express the notions of justice of English-speaking peoples' . . . [and are] 'so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" Rochin v. California, 342 U.S. 165, 169, 72 S. Ct. 205, 208, 86 L. Ed.183 (1952) (quoting Malinski v. New York, 324 U.S. 401, 416-417, 65 S. Ct. 781, 789, 88 L. Ed. 1029 (1945) (opinion of Frankfurter, J.) and Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S. Ct. 330, 332, 78 L. Ed. 674 (1934). "[B]y barring certain government actions regardless of the fairness of the procedures used to implement them, e.g., Rochin, supra, it serves to protect governmental power from being 'used for purposes of oppression.'" Daniels v. Williams, 474 U.S. 327, 331, 106 S. Ct. 662, 665 (1986).

The Supreme Court has consistently expressed great reluctance "to expand the concept of substantive due process because guideposts for responsible decision making in this unchartered area are scarce and open-ended . . . the doctrine of judicial restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." Collins v. City of Harker Heights, Texas, 112 S. Ct. at 1068.

To prevail on a substantive due process claim, a plaintiff must prove that defendants' conduct "shocks the conscience."  Gargiul v. Tompkins, 704 F.2d 661 (2d Cir. 1983); Reed v. Town of Branford, 949 F. Supp. 87, 90-91 (D.Conn. 1996); accord, Oppenheim v. Gutteridge et al., 225 F. Supp. 2d 185, 188 (D.Conn. 2002).  Indeed, plaintiff alleges, in conclusory terms, that the actions of the defendants "were shocking to the conscience."  (Complaint, ¶ 17).

The Second Circuit has noted with regard to the "shocks the conscience" test that the "acts must do more than 'offend some fastidious squeamishness or private sentimentalism…;' they must be such as to 'offend even hardened sensibilities,' or constitute force that is 'brutal' and 'offensive to human dignity.'"  DeLeon v. Little, 981 F. Supp. 728, 734-35 (D.Conn. 1997), quoting, Rochin v. California, 342 U.S. 165, 172-74 (1952).

As set forth in the attached affidavits of the individual defendants, as well as those directly involved in the incident on January 31, 2001, there is no material issue of fact that plaintiff can establish to support any claim that their actions were "shocking."  After receiving reliable information from reliable sources that plaintiff was barricaded in his home with a child following an altercation in connection with a marital dispute, the defendants' actions were measured, prudent, and restrained.  The earlier events between plaintiff and his wife and McGunigle, underscore that Rosanne Waananen and John McGunigle's description to CSP officials (Lieutenant Smith, Lieutenant Davoren, and indirectly to Master Sergeant Kumro) that plaintiff was acting irrationally, and appeared suicidal was therefore reasonable.

As Rosanne Waananen and John McGunigle's affidavits make clear, without any real dispute from plaintiff, that throughout the end of 1999 and into January of 2000 culminating in the Super Bowl weekend, plaintiff's behavior became more erratic, threatening, and indicated

that he was in a depressed state of mind.  Their concern that he was potentially violent and

suicidal was supported in fact  This included:

- Plaintiff disabling his wife's car by disconnecting the wires. (Facts,  ¶¶ 8, 9).

- Plaintiff changing the lock to the kitchen door after his wife and children left after Friday January 29, 2000,  knowing full well that they would not be able to get into the house (if for no other reason then for the children to get clothing for school) (Facts, ¶ 13);

- Plaintiff placing a bizarre and completely inappropriate note to the door, addressed to the children, referencing that their mother had accused him of being "homicidal, suicidal," and that she was "taking them away from him." (Facts ¶¶ 16-17);

- Plaintiff unilaterally installing a lock into the downstairs den and then later taking the children into that room, interrogating them causing them to be frightened and to cry. Facts ¶ 18);

- Plaintiff deliberately hanging up the telephone when his wife called him Saturday night (Facts, ¶ 10);

- Plaintiff sitting in his parked state police cruiser outside the school waiting for the children, knowing his wife was at the school. (Facts ¶ 19);

- Plaintiff following his wife (with the children in the car) in his state police cruiser on Monday afternoon. (Facts ¶ 19);

- Plaintiff threatening to harm and then physically grabbing John McGunigle and forcing him out of the house. (Facts ¶ 21, 58);

- Plaintiff deliberately locking the doors after making sure Erik was in the house and then blocking the door by moving the refrigerator to block the door, keeping his wife and McGunigle outside. (Facts ¶ 22);

- Plaintiff disconnecting his telephone in order to view dog pictures on the internet with the result that no one could reach him. (Facts ¶ 37);

- Plaintiff causing such a disruption that his daughter Audrey ran out of the house into the snow in her stocking feet and would not return. (Facts ¶ 58).

Waananen's wife and McGunigle reported these facts– reluctantly – to state police.  Indeed,

McGunigle's first call was to James Tilley, a (former) mutual friend with the plaintiff, hoping to

head off a serious incident that might threaten plaintiff's employment status.  It is noteworthy

that Tilley himself called the head of the employee assistance program – again, neither Rosanne Waananen, McGunigle nor Tilley wanted plaintiff to get into any trouble with his employer.

Given the foregoing events involving the CSP, which were triggered by plaintiff's conduct, there was nothing that happened in the entire incident that can be deemed "shocking to the conscience."   In fact, Waananen knew what to expect because he testified that "he knew the drill."  (Facts ¶ 38).  The actual outcome of the incident, in which the plaintiff's supervisor, Lieutenant Davoren, was able to get through to Waananen and calmly defuse the highly charged circumstances, underscores this point.  Each of plaintiff's factual basis to his substantive due process violation claim should be rejected.

Plaintiff first complains that defendant Kumro, who was responsible for the DPS employee assistance program ("EAP") violated "rules and norms" of the EAP by contacting Major Lynch, and did not attempt to contact plaintiff.  (Complaint, ¶¶ 6-8).  As discussed above regarding defendant Kumro's lack of direct involvement, plaintiff has no basis to challenge what actually happened from Kumro's perspective.  Trooper Tilley called her to urgently ask for her assistance in dealing with Waananen, who was embroiled in a serious marital dispute that had gone awry.  Her actions in reporting the matter to her superiors, i.e., informing Major Edward Lynch that there was a serious problem with Waananen, was unquestionably correct after she was unsuccessful in getting through to Waananen for the simple fact that he had disconnected his telephone.  Based on the information in her possession, for her to have done nothing, would have constituted a dereliction of duty (see, Exhibit 5, Affidavit of Sue Kumro).  Her actions in this case were not "shocking" whatsoever given the information presented to her from Trooper James Tilley that plaintiff had barricaded himself in his home, with a child, and would not answer his telephone.

Plaintiff next complains about the decision to call the DPS emergency tactical response team.  This too is hardly "shocking."  Lieutenant Colonel Barry ordered the DPS emergency response team to go to a vicinity near plaintiff's home as a precautionary measure.  Had he not done so, **and** had there been a tragic result (e.g., harm to the child), DPS would have been grossly negligent and derelict in their fundamental duty to ensure the safety of its citizens. See, Lee v. Sandberg, 136 F.3d 94, 104 (2d Cir. 1997)(observing the "extraordinarily difficult judgment decisions that law enforcement officers must make in domestic violence situations."); Tierney v. Davidson, et al., 133 F.3d 189, 197-198 (2d Cir. 1998)(recognizing the principle that courts have accorded "great latitude" to a police officer's to take actions in response to exigent circumstances involving danger).

As it turned out and contrary to plaintiff's testimony, the emergency response team *deployed away from plaintiff's home and was not visible to plaintiff's home*.  When the situation stabilized after Lieutenant Davoren came out of the house with Waananen, they were immediately discharged and left the scene.  Although subsequently learning that the SWAT team had been called may have been humiliating and embarrassing to the plaintiff, there is nothing that even implicates the "shocking of the conscience," given the objectively reasonable grounds for the agency to call out the emergency response team as a precautionary measure.

Plaintiff next complains about being "forced" "against his will" to Hartford Hospital for a psychiatric examination.  (Complaint, ¶ 10).  Although the plaintiff, in fact, consented to that examination and voluntarily went to the examination without incident or objection, the surrounding circumstances fully support the agency's decision that the plaintiff should be seen by a medical professional to determine whether he was a danger to himself or others.[4]   There is

---

[4] The defendants' argument on this point is fully applicable in their Qualified Immunity defense, discussed infra.

no evidence, nor allegation, that plaintiff was forcibly restrained or in any way forced to undergo any humiliating examination.  Cf., Rodriquez v. City of New York, 72 F.3d 1051, 1061 (2d Cir. 1995)(stating that an "involuntary commitment is a 'massive curtailment of liberty,' and it therefore cannot permissibly be accomplished without due process of law.").

Conn. Gen. Stat. §17a-503(a) permits any police officer who has "reasonable cause to believe that a person has psychiatric disabilities and is dangerous to himself or herself or others or gravely disabled, and in need of immediate care and treatment, may take such person into custody and take or cause such person to be taken to a general hospital for emergency examination."  Case law establishes that the decision that Waananen should undergo a mental examination is permissible if it was "objectively reasonable" for the defendants to believe that he was dangerous to himself or others.  Williams v. Lopes, 64 F. Supp. 2d 37, 42 (D.Conn. 1997)(referencing "Hospitals, Mental Health, State Police, Op. Att'y Gen. No. 89-006 of March 3, 1989, at 21, 27 (Letter to the Commissioner of the Department of Public Safety). Fundamentally, the decision whether "reasonable cause" exists under this statute, "is a discretionary function which must be exercised by the police officer."  Id.  Furthermore, given the employer-employee sub-text in this circumstance, although plaintiff's constitutional rights are not discounted by the fact that he was a police officer, it still remains that Lieutenant Colonel Barry was within his management prerogatives to require such examination for one of the agency police officers who was reportedly suicidal, violent, and acting erratically.  The legitimacy of this mental examination is underscored by the fact that plaintiff, as a police officer, has full police powers including the right to make arrests and carry and use a firearm. The Administrative and Operations manual for the State Police requires that an officer not only carry a firearm, but also respond to emergency situations and be fit for call to duty 24 hours a day. (Facts ¶ 63).  The

plaintiff does have the liberty to simply fly off the handle and say" Oh well, I'm having bad day because I any fighting with my wife."

It should be emphasized that Waananen voluntarily went with his supervisor, Lieutenant Davoren, to Hartford Hospital, was privately seen by a medical provider, and quickly released. He was never "arrested" or placed in formal "police" custody. He was not charged with any type of crime. He was not handcuffed. He was not restrained or subdued. He was not involuntarily hospitalized or subject to any "involuntary civil commitment." (Facts ¶ 64). In short, plaintiff was not confined in any constitutional sense to raise a liberty interest due process claim. Glass v. Mayas, et al., 984 F.2d 55, 57 (2d Cir. 1993). Again, given the entire circumstances of the incident, including the plaintiff's consent and acquiescence in undergoing the examination, both the agency requirement that plaintiff be seen for a mental examination, and the subsequent events that actually did occur, establish no liberty interest constitutional violation. Requiring plaintiff to undergo the mental examination was reasonable given the plaintiff's apparent marital and personal problems, his wife's expressed concern that he was suicidal.

The reasonableness of Waananen undergoing the examination was further supported by the actual results of the examination. Although Hartford Hospital found no reason for plaintiff to be committed, they did conclude that he should undergo "follow-up" through the employee assistance program. Subsequently, the evidence of plaintiff's evaluation and assessment by psychologist Dr. Kenneth Colby only further supports the reasonableness of plaintiff undergoing the examination. Dr. Colby found plaintiff to have a mental disorder of "adjustment disorder," described him as suffering from unresolved anger and seriously "functionally impaired." (Facts, ¶ 55).

Finally, plaintiff complains that following discharge from the hospital the defendants Barry, Rearick and Kumro "prohibited" the plaintiff from returning home, and limited his contact with his children, and required that he undergo psychological treatment for an extended period of time.  (Complaint, ¶ 11).  Factually, this claim is unsupported even by plaintiff's own admission since as noted above, it was Lieutenant Davoren, who is not a named defendant, who urged plaintiff to realize he could not return to his home. (Facts ¶ 49).   Further, defendants were in no position to limit plaintiff's contact with his children, nor is there any evidence to that effect.

In summary, the plaintiff's claims and the evidence before the Court establishes that the events in this case do not rise to the level of "shocking of the conscience," or a liberty interest violation under the Fourteenth Amendment.  The Court should grant summary judgment on this claim.

### B.     SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFF'S FOURTH AMENDMENT CLAIM

#### 1.  Plaintiff Was Not Subject To An Illegal Search And Seizure

The Fourth Amendment states that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. Amend. IV.  "The Fourth Amendment's "central requirement is one of reasonableness."  Illinois v. McArthur, 531 U.S. 326, 330 (2001).  The Fourth Amendment prohibits unreasonable searches and seizures, and a search conducted without a valid warrant is "per se unreasonable" subject to certain well established exceptions.  Scheckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  One of those exceptions arises when a search is freely and voluntarily consented to by either a lawful occupant of the premises or someone with similar common

authority over the place to be searched.  United States v. Matlock, 415 U.S. 164, 171 (1974);

United States v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995).  Such consent must be voluntary and

can be found from an individual's words, acts or conduct.  Krausse v. Penny, 837 F.2d 595, 597

(2d Cir. 1988).  The standard for measuring the scope of a suspect's consent under the Fourth

Amendment is that of "objective" reasonableness – i.e., what would the typical reasonable

person have understood by the exchange between the officer and the suspect.  Florida v. Jimeno,

500 U.S. 248, 251 (1991);  Koch v. Town of Brattleboro, 287 F.3d 162, 166 (2d Cir. 2002);

Garcia, 56 F.3d at 423.  The Fourth Amendment is satisfied if law enforcement officers have a

reasonable basis for believing that they received consent to conduct the particular search that was

undertaken.  Koch, 287 F.3d at 166; Garcia, 56 F.3d at 423.

In the present case, even if the entry by Lieutenants Davoren and Smith into Waananen's

home could be deemed a "search," there is no issue of material fact that ***both*** plaintiff and,

separately, his wife, voluntarily consented to their entry into the house to look around (to satisfy

their immediate concern about the safety of Waananen's son, Erik).  Before approaching the

house, Rosanne Waananen gave Lieutenant Smith a key to the house, indicating her clear intent

to voluntarily consent to CSP officials to enter the house. (Facts, ¶¶ 35, 37-39).

As to voluntary consent by Waananen himself, his deposition and the affidavits of both

Lieutenants Davoren and Smith, are in agreement as to what happened – that Waananen readily

agreed to their entry into the house.  ("Come on in," see, Facts, ¶ 39).   Further, there is no

credible evidence that Waananen was "merely acquiescing in a show of authority," United States

v. Wilson, 11 F.3d 346, 351 (2d Cir. 1993), or that he was "coerced" by the Lieutenants.  From

this undisputed evidence, the Court should conclude that Lieutenants Davoren and Smith

reasonably believed that **both** Rosanne Waananen and plaintiff had consented to their entry and there is no Fourth Amendment violation

Similarly, the so-called "search" by Lieutenants Smith and Davoren, was limited to the sole issue of securing any firearms in plaintiff's possession.  However, plaintiff also voluntarily consented to CSP securing his weapons pending the removal of the urgency of the circumstances, indeed he volunteered information about their location.  (Facts, ¶¶ 41, 45).  Even if this were deemed a "search," for Fourth Amendment purposes, a reasonable person would have understood by the exchange between Lieutenant's Davoren and Smith and plaintiff that plaintiff had given them consent to search and secure the plaintiff's firearms.  United States v. Garcia, 56 F.3d 418, 423 (2d Cir. 1995).

Furthermore, Rosanne Waananen, who had equal ownership rights to the home, had given clear consent for an entry by the CSP and was primarily concerned about safety of her son Erik and the presence of firearms, describing the weapons that the plaintiff possessed. (See, Exhibit 1, Rosanne Waananen Affidavit, ¶¶ 26, 27).  Given all of these circumstances, the Court should  conclude that plaintiff cannot establish a " search and seizure"  claim since, apart from the fact that none of the named defendants were even involved in the actions at issue, the plaintiff and his wife had given voluntary consent for the CSP to conduct an entry into the home and secure plaintiff's firearms.

In summary, plaintiff has failed to establish a Fourth Amendment violation in this complaint.

**C.          DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY FOR THE ACTIONS AS ALLEGED IN THE COMPLAINT**

If the Court finds that the plaintiff's claims are insufficient to allege violations of § 1983, the qualified immunity issue need not be reached.  However, even if the Court were to find that plaintiff's § 1983 Fourteenth Amendment and/or Fourth Amendment claims are sufficient to withstand summary judgment, then the defendants, Timothy Barry, Edward Lynch, John Rearick and Sue Kumro, are entitled to the protection of qualified immunity and summary judgment must enter in their favor.

The shield of qualified immunity generally protects government officials from liability for damages on account of their performance of discretionary official functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); LaBounty v. Coughlin, 137 F.3d 68, 73 (2d Cir. 1998).  The availability of the defense turns upon the "objective legal reasonableness" of the allegedly unlawful official action, "assessed in light of the legal rules that were clearly established at the time it was taken."  Anderson v. Creighton, 483 U.S. 635, 639, 107 S. Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (quoting Harlow v. Fitzgerald, 457 U.S. at 818-19, 102 S. Ct. at 2739).

Because qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation," where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive.  Saucier v. Katz, 533 U.S. 194, 200, 121 S. Ct. 2151, 150 L.Ed.2d 252 (2001), citing Mitchell v. Forsyth, 472 U.S. 511, 526, 86 L. Ed. 2d 411, 105 S. Ct. 2806 (1985).  The privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."  Id., 533

U.S. at 201. As a result, the Court has repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation. Id., citing Hunter v. Bryant, 502 U.S. 224, 227, 112 S. Ct. 534 ,116 L. Ed. 2d 589 (1991) (*per curiam*).

In a suit against an officer for an alleged violation of a constitutional right, the requisites of a qualified immunity defense must be considered in proper sequence. According to Saucier, a court required to rule upon the qualified immunity issue must first consider this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? Id., citing Siegert v. Gilley, 500 U.S. 226, 232, 111 S. Ct. 1789 ,114 L. Ed. 2d 277 (1991).

If no constitutional right would have been violated were the allegations established, Saucier instructs that there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. Id., 501 U.S. at 201. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable. As more fully articulated by the U.S. Supreme Court in Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508, 153 L.Ed.2d 666 (2002),

> Qualified immunity operates to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful. For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

Id., 536 U.S. at 739, (internal citations and quotations omitted).

Assuming that the factual allegations in a particular case demonstrate that there exists an underlying constitutional right, and that this right was clearly established in a particularized sense at the time the defendants acted, the final inquiry which must be undertaken in the qualified immunity analysis is the question of whether, despite the nature of the constitutional right at issue, a reasonable officer could have been mistaken as to the legal constraints upon his conduct. If such a mistake as to the legal constraints upon his conduct was objectively reasonable, the defendant is nonetheless entitled to qualified immunity.

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular [governmental] conduct. It is sometimes difficult for an [official] to determine how the relevant legal doctrine [...] will apply to the factual situation the [official] confronts. If the [official's] mistake as to what the law requires is reasonable, however, the [official] is entitled to the immunity defense.

Saucier v. Katz, supra. See also, Malley v. Briggs, 475 U.S. 335, 343, 106 S. Ct. 1092, 89 L.Ed.2d 271 (1986) (qualified immunity leaves ample room for mistaken judgments). Thus, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law, or those who act where "the law clearly proscribed the actions" taken." Saucier, supra, (quoting Anderson v. Creighton, 483 U.S. at 638-39). This aspect of the doctrine of qualified immunity recognizes that law enforcement officers are only human, and inevitably, accidents and mistakes of judgment will happen. Such mistakes alone do not open officers to personal liability. Wren v. Towe, 130 F.3d 1154, 1159 (5th Cir. 1997), cert. denied, 525 U.S. 815, 119 S. Ct. 51, 142 L. Ed. 2d 40 (1998); accord, Pritchett v. Alford, 973 F.2d 307, 313 (4th Cir. 1992)(indicating that qualified immunity affords tolerance for mistakes of judgment traceable to unsettled law, faulty information, or contextual exigencies). Accordingly,

> In cases involving the conduct of police officials, … even where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was "objectively reasonable" for him to believe that his actions were lawful at the time of the challenged act . . . .  The objective reasonableness test is met - and the defendant is entitled to qualified immunity - if officers of reasonable competence could disagree on the legality of the defendant's actions . . . .  In qualified immunity cases, we are not concerned with the correctness of the defendants' conduct, but rather with the "objective reasonableness" of their chosen course of action given the circumstances confronting them at the scene . . . . [W]hen the factual record is not in serious dispute . . . [t]he ultimate legal determination whether . . . a reasonable police officer should have known he acted unlawfully is a question of law better left for the court to decide.

Lennon v. Miller, 66 F.3d 416, 420-21 (2d Cir. 1995) (quotations and internal citations omitted);

accord, Oliviera v. Mayer, 23 F.3d 642, 649 (2d Cir. 1994), cert denied, 513 U.S. 1076, 115 S.

Ct. 721, 130 L.Ed.2d 627 (1995) (immunity ordinarily should be decided by the court in those

cases where the facts concerning the availability of the defense are undisputed).

The Supreme Court's standard of reasonableness is comparatively generous to the police

in cases where potential danger, emergency conditions or other exigent circumstances are

present.  Roy v. Inhabitants of the City of Lewiston, 42 F.3d 691, 695 (1st Cir. 1994).  For

example, in Graham v. Connor, 490 U.S. 386 (1989), the Court said that the "calculus of

reasonableness" must make "allowance" for the need of police officers "to make split-second

judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount

of force that is necessary in a particular situation."  Id. at 396-97.  Also pertinent is the Court's

more general statement in Anderson v. Creighton, addressed to qualified immunity for a Fourth

Amendment violation.  The Court used as its standard the "reasonable officer" and what "could

reasonably have been thought lawful" by such an officer, terms suggesting a measure of

deference.  Id., 483 U.S. at 638.

As discussed above in regards to the plaintiff's Fourteenth Amendment claims, the defendants actions were appropriate under the totality of the circumstances known to them at the time in reference to either plaintiff's Fourth or Fourteenth Amendment claims.

Again, without being repetitious, the Court should easily conclude that defendants Lynch, Rearick, and Kumro are immune from suit. Their actions were unquestionably objectively reasonable. With regard to the "search and seizure" component of plaintiff's claim at his home, these actions were was conducted by Lieutenants Davoren and Smith.

That leaves the issue of defendant Barry requiring plaintiff to undergo the mental examination. For qualified immunity purposes, the governing standard under the Fourth Amendment is whether the decision was based on probably cause, i.e., if there were "reasonable grounds" for believing that the person was a danger to himself or others. See, Williams v. Lopes, 64 F.Supp.2d 37, 41- 43 (D.Conn. 1999)(with reference to the "reasonable cause" standard under Conn. Gen. Stat. § 17a-503. Under this standard, a defendant must show that at the time he encountered the plaintiff, it "was objectively reasonable for [him] to believe that [he] was dangerous to [himself] or others, or gravely disabled, and in need of immediate care and treatment. Id., citing, Glass v. Mayas, 984 F.2d 55, 57 (2d Cir. 1993). As noted previously, this is a "discretionary function which must be exercised by the police officer." Id. As discussed above, there was more then sufficient grounds for defendant Barry to be concerned about plaintiff's mental state. This was based on all of the information provided to him from his subordinates based on the information from Rosanne Waananen and John McGunigle including the fact that he had been embroiled in a heated domestic violence incident, had barricaded himself in his house with a young child, and disconnected his telephone. Defendant Barry's discretionary decision ***was*** reasonable under the totality of all of these circumstances. Just

because the plaintiff left his home voluntarily does not mean that he was not a danger to himself and others.

Indeed, although plaintiff was not found to be an immediate threat to himself or others, Hartford Hospital found it necessary, and issued instructions, that plaintiff should follow up with services through the employee assistance program.  Further, his treating psychologist, Dr. Kenneth Colby, unambiguously assessed plaintiff as suffering from an "adjustment disorder," one feature of which the American Psychiatric Association has deemed, is an increase in threat of suicide.  (See, Exhibit 14).  These subsequent events thus confirm that defendant Barry's decision for plaintiff to undergo the mental examination was reasonable.  Williams, 64 F.Supp.2d  at 42-43.  Accordingly, the defendant Barry is entitled to qualified immunity for his actions relative to the instant litigation as articulated in the plaintiff's complaint.

In short, although the defendants submit that no constitution right was violated, if the Court reaches the issue of qualified immunity, their was no "clearly established" constitutional right that the defendants violated.  Their actions were eminently reasonable under the circumstances.

## CONCLUSION

For all of the above reasons, the Defendants request that the court grant their motion for summary judgment.

DEFENDANTS

RICHARD BLUMENTHAL
ATTORNEY GENERAL

By:_____
        Joseph A. Jordano
        Assistant Attorney General
        Federal Bar # ct21487
        55 Elm Street, P.O. Box  120
        Hartford, CT 06141-0120
        Tel:  (860) 808-5340
        Fax: (860) 808-5383
        E-mail: Joseph.Jordano@po.state.ct.us

## CERTIFICATION

The undersigned hereby certifies that on the    27th day of  February, 2004, a true and accurate copy of the foregoing Defendants' Memorandum in Support of their Motion for Summary Judgment was sent by U.S. Mail, postage prepaid, to the following:

John R. Williams, Esq.
Williams & Pattis, LLC
51 Elm Street, Suite 409
New Haven, CT  06510

_____
Joseph A. Jordano
Assistant Attorney General