UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NEAL E. WAANANEN, | : | CIVIL ACTION NO. |
|    *Plaintiff,* | : | 3:02CV2307 (JBA) |
| | : | |
|    v. | : | |
| | : | |
| TIMOTHY BARRY, | : | |
| EDWARD LYNCH, | : | |
| JOHN REARICK, | : | |
| SUE KUMRO, | : | |
|    *Defendants.* | : | FEBRUARY 27, 2004 |

## DEFENDANT'S LOCAL RULE 56(a)1 STATEMENT OF UNDISPUTED FACTS

1.  Neal E. Waananen ("Waananen"), the plaintiff in this action, began his employment with the State of Connecticut, Connecticut State Police ("CSP") within the Department of Public Safety (hereinafter "DPS") in November of 1982 as a Trooper Trainee and was then appointed as a Trooper on November 15, 1983. (Exhibit 10 ).

2.  On June 4, 1999, Waananen was promoted to the position of Master Sergeant, the position he has held to the present date. ( Exhibit 10).

3.  In or about January of 2000 Waananen had been residing at 3 Pilgrim Circle, in Enfield, Connecticut. At that time, Waananen was married to Rosanne Waananen and had two children, a son Erik, who was then 11 years of age and daughter Audrey, who was then 6 years of age. (Exhibit 1, Rosanne Waananen Aff., ¶¶ 2, 23).

4.  In or about January of 2000, Waananen's work assignment had been at Troop D in Danielson, Connecticut. His commanding officer was Lieutenant Thomas Davoren. (Exhibit

1

5, Affidavit of Thomas Davoren (hereinafter "Davoren Aff."; ¶ 2; Ex. 9, Waananen Depo., p. 28:14-18).

5.  At all relevant times, Lieutenant Davoren's superior was Major John Rearick, the Eastern District Commander of CSP. At all relevant times, the Western District Commander of CSP was Major Edward Lynch. Majors Rearick and Lynch reported to Lieutenant Colonel Timothy Barry who was in charge of the CSP field operations. Lieutenant Colonel Timothy Barry answered to Colonel John Bordelli, who in turn, answered to DPS Commissioner Arthur L. Spada. Master Sergeant Sue Kumro was the commanding officer of the CSP employee assistance program, who answered directly to Colonel John Bordelli. (Exhibit 8, Affidavit of Edward Lynch, (hereinafter "Lynch Aff."), ¶ 4, Ex. 4, Davoren Aff., ¶ 4).

6.  Plaintiff has sued the defendants Barry, Lynch, Rearick, and Kumro, all of whom are employees of CSP, in their individual capacities. (Complaint, ¶ 4).

7.  As of January 2000, John McGunigle had been a long-time personal friend of Waananen and his wife Rosanne Waananen. (Exhibit 2, Affidavit of John McGunigle (hereinafter "McGunigle Aff., ¶ 3; Ex. 9, Waananen Depo., p. 79:4-22).

8.  In 1999, Waananen and his wife Roseanne had become estranged in their marriage. (Exhibit 9, Excerpts of Deposition of Neil Waananen (hereinafter "Waananen Depo.", p. 70:4-22). Waananen had increasingly become hostile toward his wife, isolated himself from his wife and children, was not sleeping, displayed anger, and repeatedly made pessimistic comments to his family. His wife Rosanne expressed concern to Waananen about this behavior and urged him to get professional help. She expressed concern to her family physician, who encouraged her or someone else to convince him to seek help. By the end of 1999, Waananen

became more angry and hostile toward his wife, stopped speaking to her, and made disparaging remarks about her in front of the children, Erik and Audrey. Waananen accused his wife of turning the children against him. Rosanne Waananen became alarmed when Waananen, on more than one occasion, disconnected wires in the engine of the family automobile that prevented her from leaving the house. (Ex. 1, Rosanne Waananen Aff., ¶¶ 4-6).

9. In late January of 2000, Rosanne Waananen told Waananen that she was going to Pittsfield Massachusetts to visit relatives for the weekend (beginning on Friday, January 28, 2000). She told Waananen that she needed to get away because she found the situation at home intolerable. Before she left for Pittsfield, Waananen disabled the family automobile by disconnecting wires connected to the engine. (Ex. 9, Waananen Depo., p. 88:19-24). Rosanne Waananen was able to connect the wires and start the automobile. That afternoon, she picked Erik and Audrey up at school and went to Pittsfield. While in Pittsfield, Rosanne Waananen spoke with her husband's parents, who lived in Pittsfield, to express concern about her husband and seeking help in the matter. (Ex.. 1, Rosanne Waananen Aff. ¶¶ 7-10).

10. On the evening of Saturday, January 29, 2000, Rosanne Waananen called Waananen by telephone, but Waananen, hung up on her. (Ex. 9, Waananen Depo., p. 113:3-114:15).

11. Prior to leaving for Pittsfield, Rosanne Waananen spoke with McGunigle by telephone and told him the relationship with her husband had become intolerable and that she was going to Pittsfield with the children for the weekend. Rosanne Waananen asked McGunigle if he would speak with her husband since he was close friends with Waananen. Rosanne

Waananen expressed concern to McGunigle about whether Waananen would allow her to come back into the house.  (Ex. 1, Rosanne Waananen Aff. ¶ 9; Ex. 2, McGunigle Aff. ¶ 5).

12. McGunigle was aware that there were problems in Waananen's marriage. McGunigle had seen Waananen earlier in January 2000, and Waananen had told McGunigle about problems in his marriage.  McGunigle urged Waananen to try and work things out. McGunigle and Waananen made plans to spend January 30, 2000 (Super Bowl Sunday) together and spent that day watching the football game in a bar in Springfield Massachusetts.  While together that day,  Waananen spoke with McGunigle about the situation with his wife. McGunigle urged Waananen to let Rosanne come back home and also urged him to get some kind of counseling to deal with his problems.  Waananen had told McGunigle that he had changed the lock on the kitchen door and reassured McGunigle that he would not keep Rosanne out of the house.  (Ex. 2, McGunigle Aff., ¶¶ 4, 6, 7;  Ex. 9, Waananen Depo., pp. 129:6-131:20).

13. On Sunday, January 30, 2000, while Rosanne Waananen and the two children were in Pittsfield, Waananen changed the lock accessing the kitchen area knowing that Rosanne and the children would likely return that day or evening since they had school the next day, and not have access to the house.  Waananen, who planned to be out of the house watching the Super Bowl football game until late at night, knew that his wife and children would not have access to the house unless they broke into the house.  (Ex. 9, Waananen Depo., pp. 115:23-119:25).

14. At all relevant times, Waananen had possession of three firearms: a department (CSP) issued pistol (either a 40 caliber or 9 milimeter), a 380 pistol, and a 22 rifle.  The two pistols had ammunition in the immediate vicinity; there was no ammunition for the 22 rifle.  (Ex. 9, Waananen Depo., pp. 122:21-127:25).

15.   Early on January 31, 2000, Sergeant William Konieczny who worked at Troop D in Danielson told Lieutenant Davoran that Waananen was having marital problems with his wife Rosanne Waananen. (Ex. 5, Davoran Aff., ¶ 3).

16.   On or about Monday, January 31, 2000, Waananen wrote a note and taped it to the kitchen door addressed to the children Erick and Audrey, stating that "your mother has told people that I'm homicidal or suicidal…and that she has run back to the bosom of her family." (Ex. 9, Waananen Depo., pp. 137:14-138:16).

17.   Rosanne Waananen and the two children arrived at the house around 9:00 A.M. on January 31, 2000. Rosanne saw a note taped to the door addressed to the children from Waananen. She was alarmed by and found the note to contain rambling and inappropriate statements such as "your mother took you away from me." (Ex. 1, Rosanne Waananen Aff., ¶ 15).

18.   Waananen let Rosanne and the children into the house, and gave Rosanne a key to the kitchen door. Rosanne Waananen and the children made preparations for the children to go to school. Waananen started to interrogate the children, who became upset and started crying. Shortly thereafter, Rosanne took the children to school. (Ex. 1, Rosanne Waananen Aff., ¶ 17).

19.   Rosanne Waananen went to the children's school later that day and spoke with school officials about the marital conflict impacting her family. She remained at the school the rest of the day, during which she observed out the window that Waananen was parked outside the school in his state police cruiser. Rosanne Waanenen took the children with her when school finished that day. Waananen followed her in his state police cruiser, which caused Rosanne to be fearful; at which point she went to the parking lot of the Enfield Police Department in which

another confrontation occurred in the children's presence. Seeking to resolve the matter, Rosanne told Waananen they would talk at home. (Ex. 1, Rosanne Waananen Aff., ¶¶ 18, 19; Ex. 9, Waananen Depo., pp. 144:1-147:16).

20.     Waananen, his wife Rosanne and the children went back to the house, at which point, Waananen took the children into the den room, locked the door, and started interrogating them. Alarmed by these actions, Rosanne Waananen contacted John McGunigle by cell phone to seek his help in defusing the situation. While speaking with him, the cell phone went dead. McGunigle called back on the home phone and both Waananen and Rosanne answered the phone. Waananen became angry and agitated, yelling at McGunigle that "it was none of his business," hung up on him, and stated, "if John shows up it is not going to be good." (Ex. 1, Rosanne Waananen Aff., ¶¶ 20, 21; Ex. 2, McGunigle Aff., ¶ 8).

21.     McGunigle immediately went to the Waananen residence and arrived shortly thereafter. Rosanne Waananen let McGunigle into the house. McGunigle tried to speak with Waananen but Waananen became extremely angry and agitated, physically grabbed McGunigle and pushed him toward the kitchen, out into the porch area, yelling "get out of my house!" At that point, Rosanne told the children Erik and Audrey to go out the front door to a neighbor's house. Rosanne Waananen and both children got out the front door. Waananen then went to the front door from where he had been in the kitchen, and yelled for Erik and Audrey to stop. Audrey did not respond to him and ran down the street, however, Erik stopped and came back. Waananen took Erik into the house and locked the door. McGunigle and Rosanne Waananen were thus locked out of the house by Waananen. (Ex. 1, Rosanne Waananen Aff., ¶¶ 23, 24; Ex. 2, McGunigle Aff., ¶¶ 9-11).

22. Rosanne Waananen was frantic about getting Erik and tried to unlock the kitchen door from the porch area. Each time she unlocked the door, Waananen closed the door and relocked the lock. This repeated itself, at which point, Waananen moved the refrigerator to block the kitchen door which prevented his wife and Mr. McGunigle from entering the house. (Ex. 9, Waananen Depo., pp. 175:3-176:21; Ex. 1, Rosanne Waananen Aff., ¶ 24; Ex. 2, McGunigle Aff., ¶ 11).

23. Both Rosanne Waananen and McGunigle were alarmed and extremely fearful about the situation, especially the safety of Erik. McGunigle, hoping to defuse the situation, then called Trooper James Tilley, a state police trooper, who had been a mutual friend of both McGunigle and Waananen when the three of them had played golf. McGunigle described to Tilley the events that had transpired involving the domestic dispute at the Waananen residence including the fact that Waananen had barricaded himself in his home with a refrigerator and had his son with him. (Ex. 1, Rosanne Waananen Aff., ¶ 25; Ex. 2, McGunigle Aff., ¶ 12; Exhibit 7, Affidavit of James Tilley (hereinafter "Tilley Aff."), ¶¶ 3, 4).

24. Meanwhile, on that same day, January 31, 2000, Major Edward Lynch was supervising a heavily-attended funeral wake in Middletown, Connecticut for a deceased police officer. Master Sergeant Sue Kumro, who at that time was assigned to coordinating the DPS EAP, was also present. As the EAP Coordinator, Kumro was responsible for coordinating services offered to DPS employees to address personal and other problems. (Exhibit 4, Affidavit of Sue Kumro (hereinafter "Kumro Aff."), ¶¶ 3, 5; Ex. 8, Lynch Aff., ¶ 3).

25. In the afternoon of January 31, 2000, while present at the Dingwald wake, Kumro received a pager contact from Trooper James Tilley who was then assigned to the DPS Bureau of

7

Criminal Investigations in Meriden. (Ex. 4, Kumro Aff., ¶ 2; Ex. 7, Tilley Aff., ¶ 3; Ex. 2, McGunigle Aff., ¶ 12)

26.    Kumro returned the call to Trooper Tilley. Tilley reported to Kumro that a mutual friend of Waananen's, John McGunigle, had contacted him (Tilley) to state that after an altercation between Waananen and McGunigle, Waananen had barricaded himself in his residence in Enfield, Connecticut. Tilley informed Kumro that McGunigle said Waanenen was acting irrational, and that there was a child in the house with him. Kumro asked Tilley for assurances as to the accuracy of this information. Tilley insisted to Kumro that the situation was serious. Tilley informed Kumro that McGunigle and Waananen's wife, Roseanne had attempted to confront Waananen over purported marital and family problems leading to an altercation. Tilley informed Kumro that McGunigle indicated that Mr. Waananen had physically pushed McGunigle in an attempt to force him out of the house, and that Rosanne Waananen had fled the house with her daughter, but that the son had remained in the house. Tilley told Kumro that he had unsuccessfully tried to reach Waananen by telephone. (Ex. 7, Tilley Aff., ¶¶ 4-6; Ex. 2, McGunigle Aff., ¶12; Ex. 4, Kumro Aff., ¶¶ 5-8).

27.    Kumro immediately attempted, without success, to contact Waananen by telephone, leaving repeated messages on his answering machine to call her. Kumro then called Tilley back who insisted to Kumro that Waananen was inside the house with his son. Waananen, in fact, had disconnected his telephone. (Ex. 9, Waananen Depo., pp. 177:22-178:25; Ex. 4, Kumro Aff., ¶ 9).

28.    Since she could not reach Waananen by telephone, Kumro felt obligated because of the urgency and safety concerns for Waananen and a child reportedly in the home with him, to

8

bring the matter to the attention of CSP superiors. Kumro spoke directly with Major Edward Lynch who was present in Middletown. Kumro told Lynch that Waananen was reportedly barricaded in his house, it was reported that there may be children with him, that she had been unable to communicate with him, and was not sure whether Waananen had any firearms in the house. (Ex. 4, Kumro Aff., ¶ 10; Ex. 8, Lynch Aff., ¶ 3).

29.     Plaintiff has no knowledge whether Kumro attempted to reach him by telephone. (Ex. 9, Waananen Depo., p. 239:13-21).

30.     Upon speaking with Kumro and receiving the reported information about Waananen, Major Lynch called a subordinate, Lieutenant Eric C. Smith, who lived in Enfield (the same town where Waananen was located), and directed that he immediately go to Waananen's residence and attempt to stabilize the situation. Major Lynch also contacted Lieutenant Colonel Timothy Barry and informed him of the information that he had received. Barry indicated he would contact Major Rearick, who was in charge of the Eastern District encompassing Troop D where Waananen was assigned. (Ex. 8, Lynch Aff., ¶¶ 3-4).

31.     Lieutenant Smith arrived at Waananen's home shortly thereafter. When Smith arrived on the scene near Waananen's home on Pilgrim Circle in Enfield, no other police officials were present. Smith called the Enfield Police Department, spoke with Lieutenant Howe from Enfield who reported to Smith that the Enfield Police Department was en route to the vicinity of Waananen's home on Pilgrim Circle. Representatives of the Enfield Police Department arrived shortly thereafter. (Ex. 3, Affidavit of Eric Smith (hereinafter "Smith Aff."), ¶¶ 3-4; Ex. 8, Lynch Aff., ¶¶ 3-4; Ex. 4, Kumro Aff., ¶ 11).

32. While driving home from his normal duties at Troop D in Danielson, Lieutenant Davoren, Waananen's direct supervisor, was contacted by cell phone by Major John Rearick, the commanding officer for the Eastern District of DPS and Davoren's superior. Major Rearick informed Lieutenant Davoren that it had been reported that Mr. Waananen was barricaded in his home with his son. Major Rearick directed Lieutenant Davoren to go to Waananen's residence at Pilgrim's Circle in Enfield to respond to this information. Rearick, Davoren, and Sergeant William Konieczny (also from Troop D) arrived at Pilgrim Circle in Enfield shortly thereafter. (Ex. 5, Davoren Aff., ¶¶ 4, 5).

33. Upon receiving information that Waananen was reportedly embroiled in a domestic dispute and was barricaded in his home, defendant Lieutenant Colonel Barry decided, as a precautionary measure, to activate the CSP emergency response team and hostage negotiator, which subsequently mustered in an area a few blocks away but not visible from Waananen's residence at 3 Pilgrim Circle, Enfield, Connecticut. (Exhibit 6, Affidavit of Lieutenant Colonel Timothy Barry (hereinafter "Barry Aff.",) ¶¶ 3-6).

34. Upon arriving at Pilgrim Circle, Lieutenant Smith interviewed McGunigle and Rosanne Waananen. Smith asked, "what is the problem?" and McGunigle stated that Waananen was "flipping out," was irrational, would not come out of his house, had placed his refrigerator in front of a door, and would not come out of the house. McGunnigle stated that Waananen's wife and daughter had fled the house. McGunnigle also reported that Waananen's son was in the house with Waananen. (Ex. 3, Smith Aff., ¶ 5; Ex. 2, McGunigle Aff., ¶ 13; Ex. 1, Rosanne Waananen Aff., ¶ 26).

35.     During this initial meeting between DPS officials and Rosanne Waananen and McGunigle, Rosanne Waananen gave Lieutenant Smith a key to the house at 3 Pilgrim Circle, Enfield, where she and Waananen resided.  (Ex. 3, Smith Aff. ¶ 6; Ex. 1, Rosanne Waananen, ¶ 27)

36.     Lieutenant Davoren spoke briefly with Rosanne Waananen and McGunigle.  He was informed by them that Waananen had his son Erik with him, had barricaded himself in his house, had moved a refrigerator in front of the kitchen door to prevent them from entering the house, and disconnected his home telephone.  (Ex. 4, Davoren Aff., ¶ 6).  Upon receiving this information, Lieutenant Davoren considered that the situation was purely "tactical," i.e., he and others from CSP were not there to investigate but to deal with a serious public safety issue, in particular ensuring safety for the child who was reportedly in the home.  (Id., ¶¶ 6, 7).

37.     Lieutenant Davoren tried to call Waananen by cell phone but could not get through because Waananen had disconnected his telephone to use that line for internet access with his son Erik to look at dog pictures. (Ex. 9, Waananen Depo., p. 180:7-18).  Lieutenant Davoren then paged Waananen.  Waananen responded to the page, and eventually contacted Lieutenant Davoren by telephone.  In speaking with Waananen, Lieutenant Davoren asked Waananen if he could come inside his house.  Waananen, realizing that his wife had contacted CSP over their marital problems, agreed to this request, stating: "Okay, stop on over." Lieutenant Davoren, accompanied by Lieutenant Eric Smith, took a pizza (carried by Lieutenant Smith) that had arrived, apparently ordered by Waananen, and approached the house.  Prior to approaching the house, at the suggestion of Major Rearick, Lieutenant Davoren put on a

protective vest under his jacket. (Ex. 9, Waananen Depo., pp. 179:25-180:25, p. 182:18-25, p. 186:13-25; Ex. 4, Davoren Aff., ¶ 7; Ex. 3, Smith Aff. ¶¶ 7, 8).

38. Upon speaking with Lieutenant Davoren on the telephone, plaintiff knew "the drill," by which he understood "there's been times that I've had to go over trooper's houses when there are allegations of marital discord, and had to go over there just to make sure everything is okay, and I knew that was what he had to do as my superior, he had to come over there just to make sure everything was all right." (Ex. 9, Waananen Depo., p. 187:2-10).

39. Lieutenants Davoren and Smith were met by Waananen at his door. Lieutenant Davoren said to Waananen: "How are you doing, do you mind if we come in?" Waananen stated in response, "Come on in." (Ex. 4, Davoren Aff., ¶ 7; Ex. 3, Smith Aff., ¶ 8; Ex. 9, Waananen Depo., p. 188:7-25). Lieutenant Davoren observed that the home telephone was on the wall, the refrigerator appeared to be in place, and his son was walking around, apparently fine. (Ex. 4, Davoren Aff., ¶ 7; Ex. 3, Smith Aff., ¶ 8).

40. Lieutenant Davoren stated to Waananen that he and Lieutenant Smith were there "to make sure everything is okay," and plaintiff believed Davoren because he (Waananen) had been in similar circumstances checking on subordinates which is what plaintiff referred to as "the drill." (Ex. 9, Waananen Depo., pp. 192:17-193:5).

41. Lieutenants Davoren and Smith asked Waananen about the existence of firearms in the house, and Waananen responded that his duty firearm was in a den closet and another handgun located in his police cruiser. Lieutenants Davoren and Smith secured the firearms without objection by Waananen. Waananen indicated at that time that there were no other firearms in the house. (Ex. 3, Smith Aff., ¶ 9; Ex. 9, Waananen Depo., pp. 193:6-195:5).

42. Lieutenant Davoren then asked Waananen if he would step outside. Waananen agreed, at which point, Lieutenant Colonel Barry walked up and a discussion was conducted in which Lieutenant Colonel Barry stated that he wanted Waananen to be evaluated to insure that he was not a danger to himself or others given the allegations by his wife and friend McGunigle. (Ex. 4, Davoren Aff., ¶ 10; Ex. 3, Smith Aff., ¶ 10; Ex. 5, Kumro Aff., ¶ 15).

43. Lieutenant Colonel Barry reasonably believed that Waananen should undergo an evaluation at a hospital by a medical professional to determine if there were any present issues or problems with his mental condition requiring immediate attention. (Ex. 6, Barry Aff., ¶ 10).

44. Except for seeking clarification that Lieutenant Colonel Barry had ordered him to undergo an examination, and, that he believed he did not need to undergo such examination, Waananen agreed to go to the hospital since it was ordered by his superior in the CSP. At no time did Waananen object or otherwise indicate that he was unwilling to undergo such examination. (Ex. 9, Waananen Depo., pp. 217:9-218:9; Ex. 4, Davoren Aff., ¶ 10; Ex. 6, Barry Aff., ¶ 10).

45. Prior to reaching the hospital, Waananen volunteered to Lieutenant Davoren that he had forgotten to mention in response to their earlier inquiry about the matter, that he had a 22 rifle in a closet in the house. Lieutenant Smith secured the rifle for safe keeping. Waananen did not raise any concerns or otherwise object to Smith securing the rifle which was returned to plaintiff four days later. (Ex. 9, Waananen Depo., pp. 224:12-225:20; Ex. 3, Smith Aff., ¶ 10).

46. Waananen then accompanied Lieutenant Davoren in Davoren's state police cruiser to Hartford Hospital. On the way to the hospital, Waananen mentioned to Lieutenant Davoren that he had been having marital problems. (Ex. 4, Davoren Aff., ¶ 12).

47.     At the hospital, Waananen was privately examined by a medical professionals from Hartford Hospital, the presenting assessment noted as: "40 year old [white male] presented in [emergency room] accompanied by co-worker at CT State Police for evaluation of suicidality. Patient's wife called patient's supervisor at State Police Barracks expressing her concern that patient is suicidal [because of] marital conflict." (Exhibit 12, Hartford Hospital, Emergency Department Intake and Assessment Records; Ex. 4, Davoren Aff., ¶ 12).

48.     The Hartford Hospital emergency room discharged Waananen with instructions to "follow up with EAP." (Ex. 12).  Master Sergeant Kumro, who was in charge of the CSP EAP program was present at the hospital, in her capacity in that position, and was informed by hospital personnel that Waananen was "fine," that he could leave, but should undergo some follow-up care with a mental health professional. (Ex. 9, Waananen Depo., p. 238:4-18; Ex. 5, Kumro Aff., ¶ 17; Ex. 4, Davoren Aff., ¶ 13).

49.     Upon being discharged from the hospital, Waananen spoke with Lieutenant Davoren and Master Sergeant Kumro and it was mutually agreed by all of those present, that Waananen would not return to his home because of the serious conflict incident that had earlier occurred.  Waananen himself decided to go to a nearby motel.  Lieutenant Davoren drove Waananen to the motel that Waananen had chosen.  There was no question or objection raised by Waananen as to him staying at a motel that night. (Ex. 9, Waananen Depo., p. 241:11-243:17; Ex. 4, Davoren Aff., ¶ 13; Ex. 5, Kumro Aff., ¶ 18; Ex. 6, Barry Aff., ¶ 11).

50.     Waananen returned to work the next day after this incident and assumed his regularly scheduled duties. (Ex. 9, Waananen Depo., pp. 243:22-244:4;  Ex. 4, Davoren Aff., ¶ 14).

51. Since the entire incident involving Waananen on January 31, 2000 resolved itself peacefully, and because there was no allegation or specific information that Waananen had violated any department rules or regulations, there was no requirement or need for a formal report or an internal affairs investigation by the Connecticut State Police. (Ex. 6, Barry Aff., ¶ 12).

52. The Enfield Police Department, as part of its normal case reporting, summarized the incident that occurred at 3 Pilgrim Circle, Enfield on January 31, 2000, signed by Sergeant Patrick J. Droney, on February 1, 2000. Among other things, the report noted that McGunigle reported that Waananen was "despondent over marital difficulties," he had "barricaded himself in the house by placing a refrigerator against the door. He also had his 12-year-old son in the house with him." The report states that "[i]t was not known if Waananen had access to any weapons." (Exhibit 13, Enfield Police Department Case Report, dated January 31, 2000).

53. The Enfield Police Department report also includes a supplemental statement given by Rosanne Waananen to Sergeant L. Curtis, in which Rosanne Waananen described the problems that had developed with Waananen and the events on that day. (Ex. 13)

54. Following the events of January 31, 2000, through a referral from the CSP employee assistance program, Waananen underwent individual psychotherapy treatment with a psychologist, Dr. Kenneth A. Colby, one session every two weeks. (Exhibit 11, Treatment Records of the plaintiff from Dr. Colby, various dates). This treatment commenced sometime around February 16, 2000 and completed on or about April 19, 2000. (Ex. 11; Ex. 9, Waananen Depo., p. 254:1-12).

55. As reflected in his written assessment dated April 19, 2000, Dr. Colby assessed Waananen as initially possessing "severe" functional impairments in the area of both "job" and "relationships." Dr. Colby gave Waananen a "DSM-IV" Diagnosis on Axis I of "309.28" (Ex. 11). Under the "American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders, DSM-IV," the Axis I diagnosis of "309.28" is entitled: "adjustment disorder with mixed anxiety and depressed mood." (Exhibit 14, Excerpt, DSM-IV Manual, 4th Ed., pp. 623-627).

56. Following the incident of January 31, 2000, Waananen and his wife Rosanne Waannen were divorced by a court judgment in the Connecticut Superior Court, *Waannanen v. Waananen,* FA-00-0723791-S, Hartford Superior Court on November 20, 2001 (Barall, J.)(Exhibit 15, State of Connecticut Case Detail).

57. As part of the divorce judgment, Rosanne Waananen was awarded sole custody of the Waananen children, Erik and Audrey. (Ex. 1, Rosanne Waananen Aff., ¶ 3).

58. During the incident between plaintiff and John McGunigle on January 31, 2000 when the plaintiff grabbed McGunigle by the coat and physically "threw him out of the house," the plaintiff's children were screaming and ran out of the house into the snow in their stocking feet. (Ex. 9, Waananen Depo. pp.168:13-169:13; 171:14-18).

59. Defendant Kumro did not search the plaintiff's home, seize any property or order the plaintiff to undergo a medical/psychological evaluation. ( Ex. 5, Kumro Aff, ¶ 14; Ex. 9, Waananen Depo., p. 229:18-20, p. 238:19-23).

60. Defendant Lynch did not search the plaintiff's home, seize any property or order the plaintiff to undergo a medical/psychological evaluation. (Ex. 8, Lynch Aff., ¶ 5; Ex. 9, Waananen Depo., p. 219:10-14, p. 219:18-25, pp. 228:16-229:6).

61. Defendant Rearick did not search the plaintiff's home, seize any property or order the plaintiff to undergo a medical/psychological evaluation. (Ex. 9, Waananen Depo., p. 229:7-17).

62. Defendant Barry did not search or seize any property from the plaintiff's home. (Ex. 9, Waananen Depo., pp. 228:11-15, 229:22-230:13).

63. The State Police Administrative and Operations manual section 14.2 (b) governs the conduct of State Police officers and such policies require among other things that the plaintiff: (a) that the officer carry their off duty weapon at all times, except under certain circumstances; (b) is subject to call to duty 24 hours a day; (c) expected to render emergency aid to any person encountered. (Exhibit 16, State Police Administrative and Operations policy 14.2 (38), (39) & (50)).

64. When the plaintiff accompanied Lt. Davoren to Hartford Hospital on January 31, 2000 he was never handcuffed. (Ex. 9, Waananen Depo., pp. 220:21-221:3).

DEFENDANTS

TIMOTHY BARRY,
EDWARD LYNCH,
JOHN REARICK,
SUE KUMRO

RICHARD BLUMENTHAL
ATTORNEY GENERAL


By: _____
Joseph A. Jordano
Assistant Attorney General
Federal Bar # ct21487
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
Tel: (860) 808-5340
Fax: (860) 808-5383
E-mail: Joseph.Jordano@po.state.ct.us


## **CERTIFICATION**

I hereby certify that pursuant to §5(b) of the Federal Rules of Civil Procedure, a copy of the foregoing Rule 56(a)1 Statement of Undisputed Facts was sent via first class mail, postage prepaid, this 27th day of February, 2004, to:


John R. Williams, Esq.
Williams & Pattis, LLC
51 Elm Street, Suite 409
New Haven, CT 06510

_____
Joseph A. Jordano
Assistant Attorney General