UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NEAL E. WAANANEN | : | |
| | : | |
| VS. | : | NO. 3:02CV2307(JBA) |
| | : | |
| TIMOTHY BARRY, | : | |
| EDWARD LYNCH, | : | |
| JOHN REARICK and | : | |
| SUE KUMRO | : | MARCH 22, 2004 |

**PLAINTIFF'S LOCAL RULE 56 STATEMENT**

*I    RESPONSES TO DEFENDANTS' STATEMENTS OF FACT:*

    1. Agree.

    2. Agree.

    3. Agree.

    4. Agree.

    5. Agree.

    6. Agree.

    7. Agree.

    8. Agree with first sentence; disagree with balance.  (Plaintiff's deposition transcript, pp. 70-78)

    9. Disagree.  (Id. pp. 87-90)

    10.  Agree.

11. Agree that plaintiff's ex-wife communicated falsehoods about the plaintiff to McGunigle, which McGunigle acknowledged on January 28, 2000, he understood to be lies.  Otherwise, disagree.  (Id. pp. 91-105)

12. Disagree.  (Ibid.)

13. Disagree that plaintiff knew they would likely return that day.  (Id. p. 119) Disagree that breaking in would have been their only way of entering the house.  (Id. p. 121)  Otherwise, agree.

14. Disagree.  (Id. pp. 123-24)

15. Disagree.  (Id. pp. 100-01)

16. Agree.

17. Disagree that the statements were rambling and inappropriate and that Rosanne was alarmed.  Id. pp. 137-38) Otherwise, agree.

18. Agree with first two sentences.  Disagree with remainder.  (Id. pp. 140-41)

19. Disagree that she was fearful.  (Id. p. 145) Disagree that there was a confrontation.  (Id. p. 146) Otherwise, agree.

20. Disagree that plaintiff interrogated his children.  Disagree with second sentence.  (Id. pp. 162-66) Otherwise, agree.

21. Agree with first two sentences.  Disagree with third sentence.  (Id. pp. 166-68) Agree with fourth sentence.  Disagree with fifth sentence.  (Id. p. 171)

Agree with sixth sentence.  Agree with seventh sentence.  Disagree with eighth sentence and ninth sentence.  (Id. pp. 172-73)

22. Disagree with first clause of first sentence.  (Ibid.)  Otherwise, agree.

23. Disagree with first sentence.  (Id. p. 179) Agree that McGunigle telephoned Tilley and made claims concerning the plaintiff.  Otherwise, disagree.

24. Agree.

25. Agree.

26. Agree.

27. Agree with first two sentences.  Disagree with third sentence.  (Id. pp. 180-82)

28. Agree.

29. Agree.

30. Agree.

31. Agree.

32. Agree.

33. Agree.

34. Agree.

35. Agree.

36. Disagree with the phrase "serious public safety issue...."  (Davoren affidavit, ¶¶ 6, 7) Otherwise, agree.

37. Agree.

38. Agree.

39. Agree.

40. Agree.

41. Agree.

42. Disagree. The plaintiff was *ordered* to step outside and instructed to get his coat before doing so, and both he and the coat were searched first. The plaintiff knew this procedure meant he was being taken into custody. (Id. pp. 201-03) Disagree with balance. (Id. pp. 216-17)

43. Disagree. (Ibid.)

44. Disagree. (Ibid.)

45. Disagree. (Id. pp. 224-25)

46. Disagree. Plaintiff was in custody, was not free to leave, and was taken against his will pursuant to the direct order of defendant Barry. Throughout the trip, Lt. Davoren was on his cellphone. (Id. pp. 218-25, 230)

47. Objection. Inadmissible hearsay.

48. Objection. Inadmissible hearsay.

49. Disagree. (Id. pp. 241-43; Plaintiff's interrogatory answers, ¶ 5(b))

50. Disagree. (Plaintiff's interrogatory answers, ¶ 7)

51. Disagree. (Dept. of Public Safety Administration & Operations Manual, Chapter 12; plaintiff's deposition transcript, pp. 277-78))

52. Objection. Inadmissible hearsay.

53. Objection. Inadmissible hearsay.

54. Agree.

55. Objection. Inadmissible hearsay.

56. Agree.

57. Agree, but irrelevant.

58. Agree that the individual events took place, but disagree with the implication that they took place in isolation, without any other events also taking place at the same time, or that there existed a causal relationship.

59. Agree that she did not personally engage in those actions or issue those orders. Disagree with any implication that she was not in the chain of causation. (Plaintiff's deposition transcript, p. 239)

60. Agree that he did not personally engage in those actions or issue those orders. Disagree with any implication that he was not in the chain of causation. (Id. pp. 219-20)

61. Disagree. (Plaintiff's interrogatory answers, ¶¶ 5, 6, 7)

62. Disagree. (Ibid.)

63. Agree.

64. Agree.

## II   PLAINTIFF'S STATEMENT OF MATERIAL FACTS:

1. The Connecticut State Police Employee Assistance Program is allegedly a "confidential counseling and support service for employees who have problems, including marital problems, which adversely affect their lives family or job performance. EAP referrals can be made only by the employee himself or by a supervisor. (Plaintiff's sworn interrogatory answers, ¶ 1)

2. Trooper James Tilley was a subordinate of the plaintiff and a former friend. Under EAP rules, Tilley had no right to refer the plaintiff to EAP. (Ibid.)

3. Defendant Kumro was a close personal friend of Trooper Tilley. (Ibid.)

4. Defendant Kumro's obligation as the head of EAP was to be an advocate for the plaintiff when he was referred to EAP. (Ibid.)

5. In violation of her obligations as head of EAP, defendant Kumro simply passed on unsubstantiated third-hand information concerning the plaintiff to defendant Lynch while they were working together on a police funeral. (Ibid.)

6. Defendants Barry, Lynch and Rearick personally participated at the plaintiff's residence in the events alleged in the Complaint. (Id. ¶ 3)

7. Although there was no factual or legal basis for doing so, defendant Barry personally ordered the plaintiff to be subjected to a psychiatric examination over his objection. As a result, other state police officers were ordered to transport the plaintiff involuntarily to a psychiatric facility. (Ibid.)

8. When defendant Barry personally questioned the plaintiff at the plaintiff's residence, defendant Barry became visibly upset because it was apparent that he realized there was nothing wrong with the plaintiff, there was no justification for the police procedures he had ordered, and he himself ordered the plaintiff to be involuntarily transported for a psychiatric examination as a means of saving face. (Id. ¶ 4)

9. The plaintiff, through his insurance carrier, was forced to pay the cost of the aforesaid involuntary psychiatric examination. Moreover, the plaintiff received no compensation for the time required to undergo the said examination. (Ibid.)

10. Plaintiff was held involuntarily at a hospital for psychiatric examination for a period of approximately three hours. (Id. ¶ 5)

11. Defendant Kumro was personally present at the psychiatric hospital while the plaintiff was being involuntarily detained there. (Ibid.)

12. Defendant Rearick personally ordered the plaintiff to contact Peter Curley at Public Safety EAP after his release from the hospital. (Ibid.)

13. Defendants Barry and Rearick personally ordered the plaintiff not to return to his residence or to have any contact with his family. (Id. ¶¶ 5, 6)

14. Following the plaintiff's release from the hospital, defendants Barry and Rearick personally ordered that, although the plaintiff retained all of his police powers, he was not permitted to be armed. (Id. ¶ 7)

15.  The defendants caused the police search of the plaintiff's residence and the seizure of his personally-owned off-dutyh .380 caliber pistol and .22 caliber rifle.  (Id. ¶ 8)

16.  The defendants ordered the plaintiff to be patted down for weapons before being involuntarily transported for a psychiatric examination.  (Id. ¶ 18)

17.  At the time of the events which are the subject of this litigation, the plaintiff was a Master Sergeant with the Connecticut State Police and was the Executive Officer – second in command – of the Troop D Barracks at Danielson. (Plaintiff's deposition transcript, pp. 29-30)

18.  The plaintiff tried very hard to save his marriage, but his ex-wife had absolutely no interest in doing so.  She rejected his proposals for marriage counseling.  Although she was a professional accountant, she refused to work outside the home and then complained bitterly about the family's resulting economic difficulties.  (Id. pp. 70-78)

19.  Trooper Tilley had been angry and bitter against the plaintiff ever since a golfing incident in 1998 in which they had a rules disagreement, the golf pro supported the plaintiff's interpretation, and as a result Tilley lost the match. (Id. Pp. 83-85)

20.  On January 28, 2000, the plaintiff's ex-wife hid the keys to the family car, and refused to tell the plaintiff where they were, forcing him to use his State Police vehicle for personal errands in violation of State Police regulations.  While

performing those errands, the plaintiff heard over his radio that because of a water main break, his children's school was getting out early.  He drove to the school to pick up the children, only to learn that his ex-wife had taken them on account of what she characterized as a family emergency.  When he got home, all were missing and there was no indication where they had gone.  (Id. pp. 87-90)

21.  Mr. McGunigle, a former neighbor, then telephoned the state police, refused to speak on a taped line, and was deceptive.  The trooper who took the call considered him to be a crackpot.  (Id. pp. 91-92)

22.  Later that afternoon, McGunigle came to the plaintiff's house and, after a discussion with the plaintiff, acknowledged that the plaintiff's ex-wife had lied to him about the plaintiff.  He recognized that the plaintiff, who had just purchased new contact lenses and had his hair cut that day, was not in any way a danger to himself or others.  He apologized to the plaintiff for having called the State Police.  (Id. pp. 99-102) The plaintiff then telephoned the State Police and assured them that all was well.  (Id. pp. 104-05)

23.  Because he is a police officer, the plaintiff has firearms.  However, he is extremely cautious with them.  Any gun in his house is unloaded, broken into pieces, locked, and placed in an inaccessible location.  (Id. pp. 123-24)

24. The plaintiff's ex-wife refused to allow their children to enter the house unless the plaintiff surrendered all of his house and car keys to her. (Id. p. 159)

25. The plaintiff was very afraid of letting McGunigle into his house because he feared there might be a physical confrontation which, given his position as a State Police officer, would have been intolerable. (Id. p. 174)

26. After meeting with the plaintiff in his house, Lieutenants Davoren and Smith were entirely satisfied with the plaintiff's responses, with his son's responses, and that nothing inappropriate was going on. (Id. pp. 198-99)

27. The plaintiff was *ordered* to step outside and instructed to get his coat before doing so, and both he and the coat were searched first. The plaintiff knew this procedure meant he was being taken into custody. (Id. pp. 201-03)

28. When the plaintiff emerged from his house, Lieutenants Davoren and Smith announced that everything was okay. (Id. p. 203)

29. When the plaintiff emerged from his house, he confronted a sea of police officers, both state and local, and SWAT team members. (Id. pp. 203-04)

30. Defendant Barry then began interrogating the plaintiff. (Id. p. 206)

31. Lieutenants Davoren and Smith confirmed to defendant Barry that everything the plaintiff was reporting was true. (Id. pp. 212-13)

32. It soon became clear to defendant Barry that he had been misinformed by the plaintiff's ex-wife or others about the nature of the situation.

At that point, defendant Rearick said to defendant Barry: "Looks like you've been played, sir." Defendant Barry responded: "That remains to be seen." (Id. p. 216)

33. Defendant Barry became obviously upset that he had been misled and, to cover his embarrassment, ordered the plaintiff to a psychiatric hospital. The plaintiff protested. Defendant Barry responded that it was an order and must be obeyed. (Id. p. 217)

34. Defendant Lynch during these events was not present, but was aware of all that was going on. He had been in a position to stop these things from happening, simply by conducting an independent investigation as he should have, but did not do so and thereby proximately caused the misconduct of which the plaintiff was the victim. (Id. pp. 219-20)

35. The State Police cruiser transporting the plaintiff was met at the hospital in Hartford by five armed State Troopers. He was taken into the emergency room. His escort was called out of the room, whereupon the nurse in charge began screaming in front of a full waiting room: "You can't leave him unattended! He can't be left there alone!" (Id. pp. 232-33)

36. The plaintiff was held there for hours. (Id. p. 234)

37. The plaintiff was discharged by the medical personnel. The psychiatrist stated to him: "You don't need a psychiatrist, you need a good divorce attorney." (Id. p. 236)

38. The hospital made absolutely no recommendations for any subsequent or follow-up treatment. (Ibid.)

39. Defendant Kumro could have prevented these things from happening to the plaintiff but chose not to do so. (Id. pp. 238-39)

40. Defendant Kumro received a call from a fourth-hand party about an incident involving a Master Sergeant. She elected to take it on face value and passed this confidential information on to a Major in the State Police, leading directly to the plaintiff's injuries. Defendant Kumro never paged the plaintiff, never spoke with the plaintiff. (Id. p. 239)

41. The plaintiff suffered undocumented disciplinary action and financial losses as a result of the actions of the defendants. (Id. p. 247)

42. Lt. Davoren conveyed to the plaintiff orders from defendants Barry and Rearick that he was not permitted to return to his home after being discharged from the hospital. The plaintiff did not challenge that order because "[y]ou don't object to a superior." (Id. pp. 241-44; Plaintiff's Interrogatory answers, ¶ 5(b))

43. It is mandated by state law, by State Police regulations, and by unvarying custom, that extensive reports be generated by all participating State Police personnel in a situation like that which took place at plaintiff's home. In this case, however, there were no such reports whatsoever, except for the applications for overtime compensation by members of the State Police SWAT

Team. The failure to generate any reports constitutes a major coverup.

(Plaintiff's deposition transcript, pp. 277-78)

        THE PLAINTIFF

        BY:_____
            JOHN R. WILLIAMS (ct00215)
            51 Elm Street
            New Haven, CT 06510
            203/562-9931
            FAX: 203/776-9494
            E-Mail: jrw@johnrwilliams.com
            His Attorney

CERTIFICATION OF SERVICE

On the date above stated, a copy hereof was mailed to Joseph A. Jordano, Esq., Assistant Attorney General, P. O. Box 120, Hartford, CT 06141-0120.

_____
JOHN R. WILLIAMS