Page 1

```
 1          UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF CONNECTICUT
 2

 3                                              COPY

 4       ------------------------   }
         NEAL E. WAANANEN           }
 5            Plaintiff,            } Civil Action No.
                                    }   3:02CV2307 (JBA)
 6            VS.                   }
                                    }
 7       TIMOTHY BARRY, EDWARD      }
         LYNCH, JOHN REARICK AND    }
 8       SUE KUMRO,                 }
              Defendants.           }
 9       ------------------------   }

10

11

12       DEPOSITION OF:  NEAL WAANANEN

13       DATE:  January 27, 2004

14       HELD AT:  Department of Public Safety

15                 1111 Country Club Road

16                 Middletown, CONNECTICUT

17

18

19

20

21   Reporter: Vincent J. DeLaria, RPR, LSR #00138

22       Brandon Smith Reporting Service

23             44 Capitol Avenue

24             Hartford, CT 06106

25             Tel (860) 549-1850
```

```
 1

 2
            APPEARANCES:
 3
            REPRESENTING THE PLAINTIFF:
 4
            Williams and Pattis, LLC
 5           51 Elm Street
             Suite 409
 6           New Haven, CT 06510
             By:  Mr. Timothy J. Mahoney, Esq.
 7

 8          REPRESENTING THE DEFENDANT:

 9          Office of the Attorney General
            State of Connecticut
10          55 Elm Street
            Hartford, CT 06141
11          By:  Mr. Stephen J. Courtney, Assistant
            Attorney General
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    Q.  And it was just the day shift, so you didn't
2    have to work nights or evenings?
3    A.  No, mostly it was on an overtime basis, no,
4    sir.
5    Q.  And did you ever have to work weekends?
6    A.  No, sir, unless it was on an overtime basis
7    or something significant happening.
8    Q.  Right.  Now, that something significant
9    happening, would an emergency fall within that
10   category?
11   A.  Yes, sir.
12   Q.  Would that happen from time to time?
13   A.  Yes, sir.
14   Q.  What would be an example of that?
15   A.  When 9/11 happened, we were working
16   literally around the clock.
17   Q.  I just wonder, I'd like to do this as
18   clearly as we can, I want to ask you to describe
19   the existing organizational hierarchy that was in
20   place in January of 2000 beginning with yourself
21   and then going upwards as best you can recall?
22   A.  Yes, sir.  I was the master sergeant, which
23   is also the executive officer at Troop D.
24   Q.  Oh, I didn't get that before.  That's called
25   executive officer?

Waananen vs Barry
1/27/2004                                                                    Neal Waananen

Page 30

1  A. Yes, sir.

2  Q. What does that mean?

3  A. You're second in command. And my commanding

4  officer was Lieutenant Thomas Davoren

5  (D-a-v-o-r-e-n).

6  Q. And what was his rank?

7  A. Lieutenant.

8  Q. Is there some other description to his job?

9  I mean, is he called like the commanding officer

10 of Troop D?

11 A. Yes, sir, commanding officer.

12 Q. And then who was above Davoren?

13 A. It's a captain. I don't recall exactly who

14 was the captain at the time. I believe it might

15 have been Captain Thomas Schneider, and he would

16 have been the executive officer of Eastern

17 District. And the commanding officer of Eastern

18 District was Major John Rearick (R-e-a-r-i-c-k).

19 Q. Major?

20 A. Yes, sir.

21 Q. Now, what does the Eastern District

22 encompass?

23 A. Four troops, Troop C in Tolland, Troop D in

24 Danielson, Troop E in Montville.

25 Q. I'm sorry, could you slow down a little.

Page 69

```
1    Q.   So you knew her fairly well?
2    A.   Yeah.  I wouldn't say fairly well, but,
3    yeah, we were friendly.
4    Q.   Was there any dealings with her at all
5    toward the end of 1999 and in January of 2000?
6    A.   No, sir.
7    Q.   So when you look back in January of 2000,
8    the last time you had seen her or dealt with her
9    would have been how long?
10   A.   Probably five years, six years when I was in
11   major crime.
12   Q.   So you had not seen or dealt with her --
13   A.   I may have seen her like in training.  We
14   might be in the same class or something.  But I
15   don't have any independent recollection of that.
16   Q.   Do you know when she became responsible as
17   the commanding officer for the Employee Assistance
18   Program?
19   A.   I'm not exactly sure, no, sir.
20
21                          (A recess was taken.)
22
23   Q.   (BY MR. COURTNEY)   So as we go through the
24   year 1999, Mr. Waananen, do you remember exactly
25   when you were promoted to master sergeant in 1999?
```

Page 70

1   A. No. March. I'm going to say March.

2   Q. Early 1999?

3   A. I think it was March 6th. That's a guess.

4   Q. So in early 1999 you are in Troop D. You're

5   living in Enfield. Now, it is true, isn't it,

6   that at some point in that year or maybe even

7   earlier marital problems did develop between you

8   and your now ex-wife Rosanne?

9   A. In '99?

10  Q. Well, or I said or before.

11  A. Yes.

12  Q. When did they first emerge from your

13  perspective?

14  A. My perspective, around Thanksgiving of '99.

15  Q. Thanksgiving of 1999?

16  A. Yes.

17  Q. And what were the causes of the problems in

18  your view?

19  A. There's so many. Money was an issue.

20  Religion was an issue. Sex was an issue. My job

21  was an issue. Children were an issue. You name

22  it.

23  Q. With regards to the job, what were the

24  points of conflict as far as that goes?

25  A. Well, she had a problem with my new position

```
 1   as a master sergeant because it took me away from
 2   home as much as it did before; however, I wasn't
 3   compensated for it.
 4        And the reason for that is I was a
 5   probationary master sergeant.  For one year after
 6   you're promoted you're a probationary.  You're on
 7   probation.
 8        Q.  At the previous salary level?
 9        A.  No, at master sergeant salary level.
10        Q.  Wasn't that an increase?
11        A.  Yes, at an increase, correct.  But because I
12   was probationary, I was willing to do whatever it
13   took to make sure the job got done, but if that
14   required me going in early and staying late,
15   that's what I was going to do.
16        Q.  So it was a longer workday?
17        A.  It was a longer workday because of my
18   commute, also, and because I was putting in hours
19   that were needed for me to accomplish my task, and
20   I was not charging the State for that overtime.
21        And I told her that all that could probably
22   be discontinued once I got my year of probation
23   and was off probation.
24        Q.  So that would probably be sometime in March
25   2000?
```

Page 72

1   A.   March of 2000, correct.  We never made it
2   there.
3   Q.   And just to be clear on this, in March of
4   2000 you did pass through a probation period for
5   master sergeant?
6   A.   Yes, sir.
7   Q.   And that was after the incident in January
8   of 2000?
9   A.   Yes, sir.
10  Q.   So you can't claim that you failed your
11  probation period as a result of the department
12  taking some action against you because of what
13  happened in January of 2000?
14  A.   I have never made that claim.
15  Q.   Now, I don't want to pry into your private
16  matters, and I only want to ask you about the job,
17  but just so I know the categories of issues of
18  dispute, you said money, religion, sex, children.
19  Anything else?
20  A.   Family.
21  Q.   How did the conflict manifest itself?  I
22  mean, was there verbal arguments?  I mean, how did
23  it actually manifest itself in terms of --
24  A.   No, there was no verbal arguments.
25  Basically we just stopped communicating.

```
 1    Q.   And was there ever any physical conflict?
 2    A.   No, sir.
 3    Q.   Never?
 4    A.   Never.
 5    Q.   And it's your testimony that there was never
 6  any verbal conflict between you and your wife?
 7    A.   There might be some incidents where things
 8  might have gotten heated over words and stuff like
 9  that, but basically there was no communication at
10  all.
11    Q.   Were the children present for any of this
12  conflict?
13    A.   I believe so, yeah.  Well, especially
14  because me not speaking with her, yeah, they were
15  present all the time.
16    Q.   Now, did you pursue marriage counseling or
17  anything of that nature to try and rectify the
18  problem?
19    A.   She was not interested.
20    Q.   You were?
21    A.   Yes, sir.
22    Q.   She was not?
23    A.   That's correct.
24    Q.   Did she ever present a reason why she was
25  not?
```

Page 74

1    A.  Yeah, she said I had the problem, she
2  doesn't and --
3    Q.  When did you want to pursue marriage
4  counseling?
5    A.  Right around the holidays between
6  Thanksgiving and Christmas.
7    Q.  Had you pursued any individual counseling?
8    A.  No, sir.
9    Q.  Why not?
10   A.  I thought it was a marriage problem, and
11 that requires two people to work on.
12   Q.  Now, did you feel that there were any
13 personal issues or problems with yourself that you
14 were encountering at that time that may have been
15 contributing to the conflict in your marriage?
16   A.  Personal, yeah.  I mean, money was always an
17 issue.  She didn't work.  She was a stay-at-home
18 mom.  She chose not who work.  That was not my
19 choice.  It was her choice.  And it created a
20 financial hardship for us, but were we making ends
21 meet as far as I was concerned, yeah.
22        She was an accountant by trade and handled
23 all the finances, and, as a result, I was assuming
24 that financially we were doing okay as I was
25 working a lot of overtime to compensate for the

1   lack of her employment.

2          As far as job wise, it was a new job. It
3   was a difficult job, and it was something that I
4   was going to have to work through until I got
5   comfortable in it.

6   Q.  As it relates to my question, though, were
7   there any issues that you were encountering at
8   that time?  I just want to make sure I'm following
9   what you're saying.  You're saying there were
10  stressors on you stemming from the demands of the
11  job?

12  A.  Yes.  There always are in our job.  It's a
13  very stressful job.

14  Q.  Now, as it relates to personal issues that
15  may have contributed to the conflict with your
16  wife, anything else?

17  A.  In early January I had knee surgery, so that
18  didn't help the situation.

19  Q.  Let me ask you about that.  That occurred in
20  January?

21  A.  The surgery, yes, sir.

22  Q.  What was reason for the knee surgery?

23  A.  It was a Workers' Comp injury from many,
24  many years before that, when I was in major crime
25  carrying a body, and I never got it repaired

Page 76
1  because I couldn't afford to be out of work and
2  overtime to get it taken care of.
3      Q.  So was that something that was handled
4  through the Workers' Comp?
5      A.  Yes.
6      Q.  Did it require absence from work?
7      A.  Yes, sir.
8      Q.  How long were you out?
9      A.  I'm going to say probably a week maybe.  I
10 should have been out more; however, things at home
11 were not good, so I decided to go back to work
12 early.
13     Q.  Can we be as specific as possible?  When was
14 the surgery?  I mean, was it shortly after January
15 1st?
16     A.  Yes, sir, like the 3rd or 4th, something of
17 January.
18     Q.  And then were you out for one week?
19     A.  A week, maybe a week and a half.  I'm not
20 exactly sure.
21     Q.  So were you recuperating at home?
22     A.  Yes, sir.
23     Q.  How invasive was the surgery?
24     A.  Arthroscopic, so not too invasive.
25     Q.  And what kind of surgery?

1   A. Arthroscopic knee surgery.
2   Q. Now, did being out of work as a result of
3   the surgery contribute to any of the problems that
4   were going on at home?
5   A. I would say, yeah. I mean, I was there 24
6   hours a day with her. I didn't have the refuge of
7   going away to work.
8   Q. So would it be correct that that kind of
9   intensified the conflict with your wife?
10  A. I would say, yes, just because of the time
11  frame.
12  Q. So you mentioned that there were certain
13  stresses imposed by the job. You mentioned the
14  situation with your knee surgery. Were there
15  other stressors on you that were occurring in your
16  life at that time that were contributing to the
17  marital conflict?
18  A. No, not that I recall.
19  Q. Were there any emotional issues going on
20  with you, for example, any frustration over your
21  promotion or job status with the agency?
22  A. No, I was quite happy with my promotion and
23  my status.
24  Q. Any other stressors such as problems with
25  friends, friendships, social relations in your

Page 78

1   life?

2   A. No. Leading up to that day, no.
3   Afterwards, yes.

4   Q. Now, by late 1999 and January 2000 do you
5   recall if at that time separation or divorce was a
6   likely possibility in your mind?

7   A. It was discussed, yes.

8   Q. And what was the discussion? You're talking
9   about discussed with your wife?

10  A. Yeah. It was like, "Why don't you leave and
11  go back to your parents?"

12  Q. You said that to her?

13  A. Yeah. And she said-- because she had said
14  to me, "Why don't you just leave?" And two
15  stubborn people who neither of us were budging.

16  Q. Now, when you said to her, "Why don't you go
17  back with your parents," would that have entailed
18  your two children going with her or staying with
19  you?

20  A. I didn't know, but realistically I think
21  they probably would be going with her. She didn't
22  work.

23  Q. Now, would it be correct, that as we look
24  into January of 2000, that the marital
25  relationship was getting worse rather than staying

```
1    Q.   And that was the only trip that you took?
2    A.   Yes, I believe so, yeah.
3    Q.   And where was that?
4    A.   Myrtle Beach.
5    Q.   Who else went with you?
6    A.   There was 12 guys.
7    Q.   Other people from the State Police?
8    A.   A lot of troopers, yes.
9    Q.   Now, you know James Tilley?
10   A.   Yes, sir.
11   Q.   And how long have you known Mr. Tilley?
12   A.   He was a classmate of mine, so since '82.
13   Q.   What were your dealings with Mr. Tilley from
14   1982?
15   A.   After we graduated I didn't see him much at
16   all, and then, when I transferred to Troop C in
17   Tolland-- actually, Stafford, I take that back.
18   When I was still in Stafford, he was to Troop C,
19   and we became friends then.
20   Q.   When was that?
21   A.   '86.
22   Q.   And you became friends in 1986?
23   A.   Yes, sir.
24   Q.   Do you remember in your written discovery
25   answers referring to him as an ex-friend and
```