Page 84

1  subordinate who had a score to settle?  Do you
2  remember saying that?
3     A.  Yes, sir.
4     Q.  So I take it that sometime after 1986 you
5  were no longer friends with him?
6     A.  Correct.
7     Q.  And when did that occur?
8     A.  In '99.
9     Q.  In 1999?
10    A.  Yes, sir.
11    Q.  What happened?
12    A.  It was on that golf trip with Mr. McGunigle.
13 There was a disagreement over golf rules, and the
14 friendship dissolved from there.
15    Q.  I mean, what kind of dispute are we talking
16 about with the rules?  Do you remember the
17 incident?
18    A.  Yes, sir, absolutely.  It was an out of
19 bound issue.  A ball hit a high tension wire as it
20 was going out of bounds.  Having been a golfer at
21 college, I know the rules.  As a matter of fact,
22 they dubbed me my nickname being Rules.
23        And it was my shot, and I claimed that you
24 get to replay that no penalty or play it as it
25 lies.

1    As it so happened it did go out of bounds,
2  so you wouldn't opt for that one.  I replayed the
3  shot.  They disagreed.
4    We got a ruling from the golf pro.  He sided
5  with me.  We won the match as result of it.  There
6  goes the friendship.
7    Q.  So Tilley somehow was on the losing end of
8  that --
9    A.  Yes, sir.
10   Q.  -- development?  Now, was McGunigle involved
11 in this incident?
12   A.  Yes, sir.  He was my partner.
13   Q.  Oh.
14   A.  So he benefited from it.
15   Q.  Now, after this trip to Myrtle Beach you
16 were still friends with McGunigle at least at that
17 point?
18   A.  Yes, sir.
19   Q.  And you still remained friends with him at
20 the end of 1999 and into January of 2000?
21   A.  Yes, sir.
22   Q.  You mentioned Thanksgiving of 1999.  Was
23 there something that happened in particular that
24 reflected the problem you were having in your
25 marriage?  Did something specifically happen

Page 86

1  around that time?
2    A.  Yeah, my wife wanted to go to her family's
3  house for Thanksgiving, and I was no longer
4  accommodating, and I said, "No, I'm not going."
5    Q.  And where did her parents live?
6    A.  Pittsfield, Mass.
7    Q.  Where do your parents live?
8    A.  Pittsfield, Mass.
9    Q.  So what ended up happening?
10   A.  I don't really recall. I'm sure she went up
11 to Pittsfield, and I don't know if I stayed back
12 behind or if I went to my folks. I don't remember
13 as far as Thanksgiving goes.
14   Q.  Do you remember if you were with her or not?
15   A.  No, I don't really recall. I may have even
16 worked. I'm not even sure.
17   Q.  So did anything of any significance
18 regarding your marital relationship or your
19 situation at home occur after Thanksgiving prior
20 to the January 2000 incident?
21   A.  Christmas was the same thing. I went to my
22 family's house. She went to hers.
23   Q.  Christmas you went to your parents?
24   A.  Yes, sir.
25   Q.  By yourself?

1   A.   Yes.

2   Q.   So you spent Christmas apart from your wife?

3   A.   Yes. We rode up together. I rode back with
4   my sister.

5   Q.   So did your children go to both your parents
6   and her parents or how did that happen?

7   A.   I don't remember on that Christmas. I know
8   they were at her parents' house. I don't know if
9   they ever came over to my parents' house.

10   Q.   Now, I want to ask you about Friday, January
11   28th, which was the Friday before the incident on
12   Monday, January 31st, okay? Do you recall what
13   occurred on that date?

14   A.   Yes, sir.

15   Q.   Now, it's true that your wife Rosanne told
16   you that she was going to go to her parents' home
17   in Massachusetts?

18   A.   No, it's not true.

19   Q.   Well, you tell me what happened on that day?

20   A.   That was my every other Friday off, so I was
21   off from work that day. I had three appointments
22   scheduled for that day, two doctors appointments
23   and a haircut appointment.

24        Because I was still in a cast, I was told by
25   the department, and I know the procedures, the

Page 88

1. policy of the department, that the use of a
2. cruiser was to get me to and from work when on
3. what we call light-duty status, which was what I
4. was on.
5. So I attempted to use my family car to do
6. these, to attend these three appointments, and she
7. hid the keys from me, prevented me from using
8. our-- the family car.
9. Words were exchanged, "Where are the keys?
10. Where are the keys?" She found it humorous that I
11. couldn't find them. I became upset, knocked
12. some-- there's a basket that we keep our keys in
13. on the floor-- the basket also contains coupons in
14. it and some pens or pencils or something for
15. writing notes, on the floor. And I went storming
16. out of the house and was not happy with the fact
17. that I didn't have the keys and was going to have
18. to take the cruiser.
19. I then disabled her car-- our car-- my car
20. by I used a slim Jim, opened up the car, popped
21. the hood of the car and took the coil wire off the
22. engine.
23. Juvenile, yes, but I felt if I couldn't use
24. it, she wasn't going to use my car either.
25. I then proceeded to my appointments. The

```
 1   first one was with my orthopedic doctor where I
 2   had the cast removed.
 3       Q.  So you went to that appointment in the State
 4   Police cruiser?
 5       A.  In the cruiser, yes, sir.  Then I'm not
 6   exactly sure of the events how they all went down,
 7   but then I went to-- the second appointment I went
 8   to was for an eye exam and then a haircut
 9   appointment.
10           At some point in time in-between then I
11   heard on the radio that my children's school had
12   been let out, was being let out early, because of
13   a water main break in that part of our town, so I
14   proceeded over to the school to pick up the kids
15   because I knew their mother wouldn't be there
16   because the car wasn't working.
17           And when I got there, I discovered that my
18   children had been taken out of school earlier by
19   their mother because of a family emergency or
20   crisis is what they told me.
21           I then proceeded down back to my residence
22   and learned that my wife wasn't there and neither
23   were my children.  I assumed that they were
24   probably back in Pittsfield.
25       Q.  So, I mean, at that point, when you went
```

Page 90

1  back home, is it your testimony that you had no
2  idea that she was going to go to Pittsfield?
3      A.  Correct.
4      Q.  So you never had any discussion where she
5  said that she couldn't take it anymore, and that
6  she was going to go away for the weekend to her
7  parents' home in Pittsfield, Mass.?
8      A.  None.
9      Q.  So, in effect, you really had no idea where
10  she or the children were?
11     A.  No.  I had my suspicions, but, no, I did not
12  have.
13     Q.  I mean, you said you assumed they went to
14  Pittsfield, but, in effect, you didn't know where
15  they were?
16     A.  Right, that's correct.
17     Q.  So you had no understanding about what her
18  plans were at that point?
19     A.  No.
20     Q.  Did you know whether she was anxious about
21  your letting her back in the house?
22     A.  I don't get-- letting her back in the house?
23  I have no idea.  She was not prohibited from
24  entering the house.
25     Q.  So did anything further happen on that day,

```
1    Friday, January 28th?
2    A.  Yes, sir.
3    Q.  What happened?
4    A.  When I arrived home my-- actually, when I
5    was out, my pager had gone off.  I called the
6    troop.  It was the troop calling me, and they had
7    been alerted by John McGunigle that he had called
8    there insisting to contact me, and he alerted them
9    to the possibilities of there being a problem even
10   though he thinks that he didn't.
11          He asked to speak to the deskman on the
12   untaped line, which is a telltale sign for us that
13   you don't want it taped, so it's got to be
14   something that we call sensitive, or Code B is our
15   terminology that we use, dialogue.
16          So the trooper spoke with him on an untaped
17   line.  He expressed to him that, "I got to get in
18   touch with Neal, and it's urgent."  And the
19   trooper became concerned for my welfare and the
20   welfare of my family to know what was going on.
21   But this man was being very cryptic, and so they
22   paged me.  That's what the trooper relayed to me.
23   Q.  Now, who was it that received the call from
24   McGunigle and paged you?
25   A.  Trooper Terrance McFadden (M-c-F-a-d-d-e-n).
```

Page 92

1   Q.  So as far as what Mr. McFadden told you, Mr.
2   McGunigle the content of his communication to the
3   troop was that it was urgent that he speak with
4   you?
5   A.  Correct, and that he was being very cryptic
6   and deceptive, and something was wrong.
7   Q.  So what happened next?
8   A.  I told Trooper McFadden-- well, Trooper
9   McFadden was also concerned that Mr. McGunigle
10  might be a crackpot and said, "Do you know this
11  guy?" I said, "Yeah, I know him." And he said,
12  "Well, what's going on? Is everything all right
13  with your family?" I said, "Yes, everything's
14  fine." I said, "Don't worry about it. I'll take
15  care of it. I'll contact Mr. McGunigle."
16      And with that I proceeded I think at that
17  point to another one of my other appointments,
18  didn't contact Mr. McGunigle at that point in
19  time, returned home where I encountered my sister
20  at my residence.
21  Q.  Now, what's her full name?
22  A.  Laurel (L-a-u-r-e-l) Slate. And, as a
23  matter of fact, she has the same car that we had
24  at the time, and she was parked in the same spot
25  that I had left my car that I had disabled, so I

Page 93

```
 1   had assumed that was my car, and my wife was in
 2   the house, and the kids were in the house.
 3         But when I got in the house, low and behold,
 4   it wasn't.  It was my sister.
 5      Q.  She was in the house?
 6      A.  Yes.
 7      Q.  Did she have a key to your house?
 8      A.  No, sir.
 9      Q.  How did she get in?
10      A.  I'm assuming my wife let her in.  She
11   contacted my wife-- I should say, my wife
12   contacted her.
13      Q.  So as I understand it, at least from your
14   point of view, your sister Laurel Slate was
15   admitted into the home by your wife, and then your
16   wife must have left?
17      A.  Correct.
18      Q.  But Laurel stayed in the house?
19      A.  Correct.
20      Q.  About what time was it that you went to the
21   home when your sister Laurel Slate was there?
22      A.  Noonish.
23      Q.  So what happened when you discovered your
24   sister Laurel Slate in the house?
25      A.  I told her to leave because she was sticking
```

Page 94

1   her nose into my business.

2   Q. Did she say something to you?

3   A. Yes.

4   Q. What did she say?

5   A. "We need to talk," or something along those

6   lines. I said, "No, we don't. This is my

7   problem. Get out of my house."

8       And then she said, she made a comment, "Why?

9   What are you going to do get your gun and shoot

10  me?" And I just looked at her and went, "Get out

11  of my house."

12      I had no idea where that comment came from,

13  but I sensed that she had been told things that

14  weren't true.

15  Q. How would you describe your relationship

16  with your sister Laurel Slate up to that point?

17  A. Fine. She's my older sister. I mean,

18  brother, sister.

19  Q. Would you agree that your demeanor toward

20  her was angry and even hostile about wanting her

21  to get out and not get involved in your personal

22  matters?

23  A. Hostile, no. Angry, yeah. She was-- she

24  was treading in areas that she shouldn't be

25  treading in my house.

```
1    Q.  So what happened next?
2    A.  I actually started to leave because she
3  wasn't going to leave, and I just shook my head
4  and said, wait a minute, I'm actually leaving my
5  own house.  And she was actually speaking to me in
6  our enclosed breezeway.  I then proceeded into the
7  main portion of the house, and I locked her out,
8  and she eventually left.
9    Q.  So she was in the breezeway?
10   A.  Yes, it's an enclosed-- it's actually, I
11 guess, for lack of a better term, like a mud room,
12 a sun room, whatever you want to call it.
13   Q.  So you never did have any discussion about
14 what was going on?
15   A.  No, sir, not with her.
16   Q.  Now, had Laurel been involved in any
17 previous discussions or involved in any role as it
18 related to the marital conflict that was going on
19 with you and your then wife Rosanne?
20   A.  Other than a ride home from Christmastime,
21 that was it.
22   Q.  Was she friends with your ex-wife Rosanne?
23   A.  Not friends, sister-in-laws.  Friendship?
24 No, they didn't hang out together.  They didn't do
25 anything together.  But were they cordial to each
```

Page 96

1   other?  Yes.

2   Q.  Did you perceive at that point that she was
3   taking your ex-wife's side in the dispute?

4   A.  First off, I wouldn't call it a dispute, but
5   she was taking her side at that point, yes.

6   Q.  And what's your reasoning for believing that
7   was the case?

8   A.  She was there.  I didn't call her.  My wife
9   must have called her to enlist her help, and now
10  she's sticking her nose into my business.

11  Q.  But as your sister, wouldn't it have been
12  conceivable that she might have wanted to assist
13  in the situation to your benefit because of that
14  relationship with you?

15  A.  I don't look to people for help, and she
16  knows that.  My family that's how we were raised.
17  And her sticking her nose in was totally
18  inappropriate, and she realizes that, and she
19  recognizes it herself to this day, and she still
20  beats herself up over it, but she was duped.  What
21  can you say?

22  Q.  So you locked her out when she was in the
23  breezeway, and she left?

24  A.  Yes, sir.

25  Q.  And again, this was around noontime?

1    A.   That's a guess, yes, sir.

2    Q.   Anything else happen on Friday, on January
3    28th?

4    A.   Yes, sir.

5    Q.   What happened next?

6    A.   The troop paged me again.  Mr. McGunigle had
7    called them again more in panic this time, and
8    there was real concern on the trooper's voice that
9    he sense that something was wrong and amiss.

10   Q.   Do you know what Mr. McGunigle's message to
11   the troop was?

12   A.   Yeah, that he hadn't heard from me, and he's
13   concerned and needed to speak with me and the same
14   things that he had asked before.

15        I told the trooper again, "Don't worry.
16   I'll take care of it."  And realized now that she
17   had contacted him because what's his great urgency
18   here?  And I had no interest in speaking to him at
19   the moment either.

20   Q.   You presumed that your ex-wife had contacted
21   him?  You didn't know that for a fact?

22   A.   No, I didn't know it for a fact, but my
23   sister was at my house.  It doesn't take a rocket
24   scientist, and, being a detective, my instincts
25   are pretty good.

Page 98

1  Q. So the troop passed on this information to
2  you about Mr. McGunigle's second phone call?
3  A. Yes.
4  Q. What happened at that point?
5  A. I checked my voice mail messages, my
6  answering machine. There was a message there from
7  McGunigle.
8  Q. Now, are we talking about your home
9  answering machine?
10 A. Yes. And it said something along the lines,
11 "Give me a call. Are we still on for Super Bowl
12 Sunday?"
13 Q. Had you made previous plans to be together
14 for Super Bowl Sunday?
15 A. We generally do, yes.
16 Q. So what did you do?
17 A. I didn't call him. I didn't want him
18 sticking his nose in my business either, so I
19 didn't give him a call. And, I don't know,
20 minutes later there was a mad banging on my door.
21 Q. What time are we talking?
22 A. Maybe one o'clock or so.
23 Q. And we're talking Friday, again, right?
24 A. Yes, sir.
25 Q. And was that Mr. McGunigle?