Page 142

1   A.  Yes, sir.
2   Q.  So you went to the Troop C gym to workout.
3   What happened next?
4   A.  On my way home from the gym at the troop I
5   decided to drive by the kids' school.
6   Q.  What was your intention?
7   A.  Because I just assumed that she was still
8   there, their mother was probably there.  I wanted
9   to see if the mother was there.
10      As I drove by the school I saw my car there
11  and realized that she was there doing who knows
12  what, telling people who knows what, but I'm sure
13  it wasn't something pleasant and something nice
14  about me, and realized that she had now enlisted
15  their help as she had on Friday.  So I just went
16  home.
17  Q.  And what time was that?
18  A.  Noon I'm going to guess.
19  Q.  What happened after that?
20  A.  I went to pick up the kids at school at
21  around 3:00.  That's when they get out at three
22  o'clock.
23  Q.  Now, why is it that you went to pick them
24  up?
25  A.  Because I was concerned that I may never see

1   Q.  Do you think that she may have been
2   concerned about the fact that you were following
3   her?
4   A.  Do I think that?  Probably in reality, no.
5   Would she tell you?  Yes.  Oh, yeah.
6   Q.  Did she go to the Enfield Police Department?
7   A.  Yes, she did.
8   Q.  And so what happened?
9   A.  I expected the whole calvary to come running
10  out of the Enfield PD, but nobody came out.  She
11  was still on the cell phone.  I sat there with my
12  hands on the steering wheel because I expected to
13  be taken out of my car and asked what I'm doing
14  ba, ba, ba.  And nothing occurred.
15       And I said, okay, now-- when we were pulling
16  in there, I said, okay, now we have taken this to
17  a new level.  Now it's to the local police
18  department level, which is something no trooper
19  ever wants to get involved in.
20       So when nobody came out, I'm scratching my
21  head again saying, what the hell is going on?
22  She's on the cell phone.  No cops are coming out.
23  This doesn't make any sense at all.
24       So I proceeded to exit my car and knock on
25  the window.  I told the kids to roll down their

Page 146

1   windows. She would roll them up. They would roll
2   them down. She would roll them up.
3       So I said, "Fine, kids, we'll talk through
4   the windows." And she kept saying, "You better
5   leave. You better leave." And I said, "I'm not
6   going anywhere. This is the safest place in the
7   world for me to be. I have no concerns about
8   being here."
9       So I spoke to the kids through the window
10  telling them my side of the story, telling them
11  everything is not the way it appears, and that
12  there's always two sides to every story, that they
13  had to have my side of the story to make their
14  own.
15  Q.  What was the demeanor of Audrey and Erik?
16  A.  Happy to see me but confused and concerned
17  about the tension between their mother and I. They
18  wanted to talk to me. They wanted to hear my side
19  of the story.
20  Q.  And your wife didn't drive away?
21  A.  No.
22  Q.  So she wasn't prohibiting you from having
23  discussion with them at least at that point?
24  A.  Well, I mean, she was rolling up the window
25  when I'm trying to talk to them, but so I talked

Page 149

ORIGINAL     JURAT

I, NEAL WAANANEN, do hereby certify that the foregoing testimony given by me on January 27, 2004, is true and accurate, including any corrections noted on the corrections page, to the best of my knowledge and belief.

*[signature: Neal Waananen]*

NEAL WAANANEN

At _____ in said county of _____ this 20th day of February, 2004, personally appeared NEAL WAANANEN, and he made oath to the truth of the foregoing corrections by him subscribed.

Before me, Joseph Biela, Notary Public. *[signature]*

My Commission Expires: 7/31/05

Page 151

1  STATE OF CONNECTICUT
   I, VINCENT J. DELARIA, a Registered
2  Professional Reporter/Notary Public within
   and for the State of Connecticut, do hereby
3  certify that I took the deposition of NEAL
   WAANANEN, on January 27, 2004, at the
4  offices of Department of Public Safety,
   1111 Country Club Road, Middletown,
5  Connecticut.

6     I further certify that the above-named
   deponent was by me duly sworn to testify to
7  the truth, the whole truth and nothing but
   the truth concerning his/her knowledge in
8  the matter of the case of, Neal E. Waananen
   vs. Timothy Barry, et al., now pending in
9  the US District Court, District of
   Connecticut.
10
      I further certify that the testimony was
11 taken by me stenographically and reduced to
   typewritten form under my direction by
12 means of COMPUTER ASSISTED TRANSCRIPTION;
   and I further certify that said deposition
13 is a true record of the testimony given by
   said witness.
14
      I further certify that I am neither
15 counsel for, related to, nor employed by
   any of the parties to the action in which
16 this deposition was taken; and further,
   that I am not a relative or employee of any
17 attorney or counsel employed by the parties
   hereto, nor financially or otherwise
18 interested in the outcome of the action.

19    WITNESS my hand and my seal this 6th day
   of February, 2004.
20

21

22                  *Vincent J. DeLaria* (signature)

23        Vincent J. DeLaria, RPR, LSR
          Notary Public
24
   My Commission Expires:
25 March 31, 2005

Page 152

```
1              UNITED STATES DISTRICT COURT
                 DISTRICT OF CONNECTICUT
2                                                    COPY

3    - - - - - - - - - - - - - - - x
                                   |
4    NEAL E. WAANANEN,             |
             Plaintiff,            |    Civil Action No.
5                                  |    3:02CV2307(JBA)
     VS.                           |
6                                  |
     TIMOTHY BARRY, EDWARD LYNCH,  |
7    JOHN REARICK AND SUE KUMRO,   |
             Defendants.           |
8                                  |
     - - - - - - - - - - - - - - - x
9

10

11        CONTINUED DEPOSITION OF:  Neal E. Waananen
          DATE:  February 13, 2004
12        HELD AT:  Department of Public Safety
                    Headquarters
13                  111 Country Club Road
                    Middletown, Connecticut
14

15

16

17

18

19

20

21
          Reporter:  Robin L. Balletto, RPR, LSR # 230
22           BRANDON SMITH REPORTING SERVICE
                      (860) 549-1850
23                  44 Capitol Avenue
             Hartford, Connecticut  06106
24

25
```

Page 153

1
    APPEARANCES:
2

3       Representing the Plaintiff

4           WILLIAMS & PATTIS, LLC
            Christy Doyle, Esq.
5           51 Elm Street
            Suite 409
6           New Haven, Connecticut  06510

7

8       Representing the Defendants

9           OFFICE OF THE ATTORNEY GENERAL
            Stephen J. Courtney, Esq.
10          Joseph Jordano, Esq.
            55 Elm Street
11          Hartford, Connecticut  06141-0120

12

13

14
        Also Present:
15                      Sue Kumro

16

17

18

19

20

21

22

23

24

25

1    to you?

2    A    I signed paperwork at their office, at my

3    attorney's office for releases.

4    Q    Well, we'll talk about Dr. Vincent. Last time

5    we were actually talking about the events as they

6    transpired on Monday, January 31, 2000, that was the day

7    after the Superbowl. We had talked about and you had

8    testified about the events that occurred from when your

9    wife picked up your two children at the school, you were

10   in your car behind them, you stopped in the Enfield

11   Police Department parking lot, there was some

12   discussions that took place between you and your wife

13   and your children, and then if I recall correctly, you

14   testified that you and your wife agreed that you would

15   return back to the home, to your home?

16   A    Yes, sir.

17   Q    Do you recall that?

18   A    Yes, sir.

19   Q    I would like to pick up from that point and

20   move forward.

21   A    Can I speak on behalf of a correction of

22   something that I said from the last one?

23   Q    Yes.

24   A    Is now the time to do it?

25   Q    Yes.

Waananen vs Barry

2/13/2004                                                Neal Waananen

Page 159

1   A   Checking over some information that I had,
2   when I said that my wife had never notified me that she
3   was going up to Pittsfield, I believe now she did leave
4   me an answering machine message that I retrieved on
5   Friday, which would have been the 29th, I believe the
6   29th.
7   Q   So as of Friday, January 29th, you were aware
8   or you had knowledge, at least from the message from
9   her, that she and the children were in Pittsfield,
10  Massachusetts?
11  A   Yes.
12  Q   All right. So what happened after you agreed
13  in the Enfield Police Department parking lot to go back
14  to the home, what happened next?
15  A   We proceeded back to the residence, I parked
16  in the -- I'm not sure if it is in the driveway or in
17  the garage proper, and my son came up to me and said
18  that mom won't let us go inside until you turn over your
19  keys to her. I then said that is not going to happen,
20  because if I turned over my keys to her, I had no house
21  keys to get back into the house, I had no then car keys
22  if she drove away, that is what I was afraid of that she
23  would drive away with the keys leaving me stranded
24  there.
25  Q   Did you know what set of keys he was referring

Page 162

```
1      Q     So what happened next?
2      A     The children and I went into the den, which
3   was now where I was residing as my bedroom, we proceeded
4   in there and sat down and started talking about the
5   events of the whole weekend.
6      Q     Did you shut the door when you went into the
7   bedroom?
8      A     Yes, sir.
9      Q     And if I'm not mistaken, you previously had
10  testified that you had actually installed a lock on that
11  door?
12     A     That's correct.
13     Q     Did you lock the door?
14     A     Yes, I did.
15     Q     So how long were you in the room with your two
16  children?
17     A     Total probably, I'm going to guess, 20 minutes
18  or so.
19     Q     And what was the content of your discussions
20  with them?
21     A     It was very brief, because during the
22  beginning of our conversation the telephone rang, and I
23  proceeded to pick up the --
24     Q     Now, which telephone are we talking about?
25     A     The house telephone.
```

Page 163

1   Q   Now, were there any other telephones?
2   A   She has a cell phone.
3   Q   You didn't have a cell phone?
4   A   No, sir.
5   Q   So the house telephone rang?
6   A   Yes, sir.
7   Q   And what happened?
8   A   I picked up the receiver, she picked up the
9   other receiver in the house, I'm guessing probably in
10  the kitchen simultaneous to me, and she proceeded to
11  answer it, say hello, and I heard a voice that I
12  recognized as John McGunigle, a former friend and
13  neighbor of mine, on the phone saying to her --
14  Q   Of course at that time he was still your
15  friend?
16  A   Yes, sir, saying to her, Roseanne, can you
17  talk, is Neal there?  And it dawned on me right then and
18  there that he was, in my opinion, conspiring, working
19  with her, whatever words you want to use, and I couldn't
20  believe the betrayal I felt with this discovery.
21  Q   Well, you had been with Mr. McGunigle the
22  night before watching the Superbowl football game?
23  A   Yes, sir.
24  Q   And you've previously testified that when you
25  were with him that evening you talked about your marital

Page 164

1   difficulties with your wife Roseanne?
2       A    That's correct.
3       Q    Did you have personal knowledge that she had
4   been in touch with him at around that time prior to this
5   phone call on Monday around 4 p.m.?
6       A    No.  That is why it was so devastating when I
7   heard him on the phone with her.  She couldn't stand
8   him, she finds him contemptible, and here he is calling
9   her and asking to speak with her.
10      Q    Well, when the phone rang, I mean, did you
11  pick it up and say hello as well?
12      A    No, sir.  She had picked it up and was saying
13  hello when I heard his voice.
14      Q    And he said, Roseanne, is Neal there?
15      A    He said, Can you talk, is Neal there?
16      Q    Okay, so what happened next?
17      A    She said, I think he's on the other line, and
18  I said, Yes, I am, you, and I had a few choice words for
19  him.
20      Q    What did you exactly say?
21      A    I don't remember, I think I called him a
22  Judas, and I think I called him a few other choice
23  words.  My children were there, so I probably refrained
24  from profanities, but --
25      Q    But you were angry?

Page 165

1  A    Yes, very much so. Hurt more than angry, but
2  felt betrayed.
3  Q    And was your voice raised when you spoke to
4  him on the phone?
5  A    It was stern. I would say raised, no, but
6  stern.
7  Q    What else did you say?
8  A    He said he was coming over to the house, I
9  said, No, you are not, and was back and forth with that,
10 oh, yes I am, and I said, You better not show your face
11 here. And she was encouraging him, yes, get over here,
12 get over here, get over here.
13 Q    Anything else? Was anything else discussed in
14 the phone call?
15 A    No, I don't believe so.
16 Q    And this was in -- Audrey your daughter and
17 your son Erik were present when this occurred?
18 A    Yes.
19 Q    Do you recall what their reactions were to
20 what was taking place at the moment?
21 A    I don't believe they knew who it was on the
22 telephone at that time. I told them afterwards, after I
23 hung up.
24 Q    And what was their state, what was their
25 demeanor at that point?

Page 166

```
 1      A    Scared, confused, frightened.

 2      Q    Okay.  So what happened next?

 3      A    I explained to the children that Mr. McGunigle

 4  was probably coming over, because I knew I didn't get

 5  through to him, and I explained to them also that it

 6  would be better if they stayed in the den when he showed

 7  up there, because I was very concerned about what was

 8  going to transpire when he arrived.

 9      Q    And what was the nature of your concern about

10  him coming over, what might transpire?

11      A    Well, he was sticking his nose into my

12  personal business, he was told he wasn't welcome there,

13  and still he's going to come over there and get in my

14  face.  I was very concerned that it might escalate into

15  something physical.

16      Q    And did Mr. McGunigle come to your house?

17      A    Yes, he did.

18      Q    How soon after you ended the phone call?

19      A    Probably within -- I could tell he was on his

20  cell phone, I would guess within 10, 15 minutes.

21      Q    And what happened next?

22      A    I do recall my car was parked in the garage,

23  because he pulled in the driveway with his Chevy

24  Suburban and blocked me in, my car in the garage.  He

25  came into the house and started pounding on the door to
```

Page 167

```
1    the den, and telling me to open up the door, and the
2    kids were beside themselves.
3       Q    Now, do you know how he came into the house?
4       A    Yes, my wife let him in.
5       Q    Do you know which door she let him in?
6       A    No, sir.
7       Q    So he could have come in through either the
8    kitchen door or the front door?
9       A    Could have come in through the bulkhead in the
10   cellar.  I'm guessing through the kitchen door.
11      Q    So you were in the den room with the door
12   locked with Audrey and Erik in the room with you, and it
13   is your testimony that he started knocking on the door?
14      A    Not knocking, pounding on the door.
15      Q    Was he saying anything?
16      A    Yes, open up the door, we need to talk.
17      Q    So what happened next?
18      A    I shouted through the door get out of my
19   house, get out of my house repeatedly.  He kept pounding
20   on the door.  The kids were frantic, so I opened up the
21   door and confronted him.
22      Q    What happened?
23      A    I closed the door behind me, because I
24   actually believed that it might get into a physical
25   altercation.  I did not want my children seeing this,
```