Page 241

1   overnight, no, sir.
2   Q   You weren't committed?
3   A   We call that a committal, sir.
4   Q   Undergoing the examination itself?
5   A   Yes, sir.
6   Q   But you weren't hospitalized following the
7   evaluation?
8   A   That's correct.
9   Q   So once you were told that you were discharged
10  from the hospital, what happened next?
11  A   I was taken back to my residence by
12  lieutenant, then Lieutenant Davoren, I was told that I
13  was not to return to my residence, that I would have to
14  find alternate places to reside.
15  Q   And who told you that?
16  A   Lieutenant Davoren that he was going to ensure
17  that that took place, and he proceeded to drive me back
18  to my residence, and instructed me to stay in his
19  cruiser while he went into my house to retrieve my keys
20  so that I could drive to -- he wanted me to drive to a
21  friend or family's place, and I said, Absolutely not,
22  I'm not involving anybody else in this debacle, and
23  instead I said, I'll opt for a hotel, which is what I
24  did do.
25  Q   And you told him that?

Page 242

1    A    Yes, sir.

2    Q    And did you select a hotel?

3    A    Yes, sir.

4    Q    And which hotel was that?

5    A    I can't even remember. I think it was Motel 6
6  or something that is on Route 5 in Enfield near the old
7  Bradlees/Stop & Shop.

8    Q    Did Lieutenant Davoren only go in to get your
9  keys?

10   A    No, sir. He went in to get my keys at the
11 residence. When he came back out, he came back out with
12 some of my keys missing from my key ring, minus the
13 house keys that he said he left behind, and he had like
14 an overnight bag that my then wife had prepared.

15   Q    Now, did you then take your cruiser?

16   A    Yes, sir.

17   Q    And what happened next?

18   A    He followed me to the hotel that I selected,
19 while still in uniform, came inside as I registered, the
20 woman looking at me wondering why is a State Police
21 uniformed trooper, they don't know the difference
22 between lieutenants and troopers, is there with me, and
23 I was humiliated by the fact that he's in there with me.
24 I then proceeded to register and get a room, and I then
25 went up to my room. Actually, Lieutenant Davoren

```
 1   carried my bags up to my room for me because of my knee
 2   injury.
 3       Q   And I think you've previously indicated last
 4   time that you never went home again after that, right?
 5       A   Well, yes, I did, but I mean, to reside, no,
 6   sir.
 7       Q   I mean, you never resided any further at your
 8   home?
 9       A   That's correct.  I was told I couldn't.
10       Q   Well, who told you you couldn't go home?
11       A   Lieutenant Davoren.
12       Q   And you never objected to --
13       A   To a superior?
14       Q   To his statement that you couldn't go at home?
15               MR. DOYLE:  Object to the form.  Go
16   ahead.
17       A   You don't object to a superior.
18   BY MR. COURTNEY:
19       Q   Now, that Monday you were off on a vacation
20   day?
21       A   That's correct.
22       Q   So when was your next regular assigned
23   workday?
24       A   The next morning.
25       Q   Did you go to work the next day?
```

Page 244

1    A    Yes, sir.

2    Q    So you didn't miss any work as a result of
3    this incident that occurred?

4    A    No, sir.

5    Q    Now, in the complaint you claim that Barry,
6    Rearick and Kumro prohibited you from returning home.
7    Did either of those three named Defendants in this case,
8    did they ever prohibit you from returning to your home?

9    A    It was Lieutenant Davoren that told me I
10   couldn't return to my residence. Later then Major
11   Rearick rescinded that and said that it was a
12   misunderstanding.

13   Q    You also claimed that Barry, Rearick and Kumro
14   prohibited you from having anything but extremely
15   limited contact with your children. Now, is that an
16   accurate claim?

17   A    Well, they limited, they didn't allow me to
18   see my children.

19   Q    You're saying Master Sergeant Kumro prohibited
20   you from having anything about extremely limited contact
21   with your children?

22   A    No, she actually brokered the deal so I could
23   see my kids on Thursday afternoon.

24   Q    So she didn't prohibit you from having
25   contact?

Page 245

1    A    No, but she -- there was no court orders to
2    prohibit me from seeing my children, however, Master
3    Sergeant Kumro took it upon herself to broker a deal so
4    that I could see my kids for a very small amount of
5    time.
6    Q    Well, that was something to your advantage and
7    something you desired?
8    A    To my advantage, no. At that point in time
9    there was nothing to prohibit me from seeing my
10   children. She was putting her nose in my personal
11   business that she had no right to stick her nose in.
12   Q    But she didn't order you or in some way issue
13   some edict that prohibited you from having contact with
14   your children, did she?
15   A    No, but she brokered a deal with my ex-wife to
16   limit the amount of time that I could see my kids.
17   Q    Well, as to any restricted contact with your
18   children, any of the Defendants, Barry, Lynch, Rearick
19   and Kumro, they had no influence on the issue of your
20   contact with your children after January 31 of 2000,
21   right?
22   A    They had no --
23        MR. DOYLE: Just one minute, can we hold
24   on for one second. Just to note for the record, I'm not
25   sure of your name, sir, but can we go off the record

Page 246

1    actually.
2              (Off-the-record discussion.)
3    BY MR. COURTNEY:
4        Q    Now, just to be clear, apart from the claims
5    that you've asserted in the lawsuit that was filed on
6    December 24, 2002, you never voiced or in writing
7    objected to the pistols and rifles from being detained;
8    isn't that true?
9        A    I never voiced or objected to the pistols and
10   rifles being seized from my residence?
11       Q    Well, I didn't use that word seized, but you
12   never verbally or in writing ever objected to the
13   pistols and the rifles being held by the State Police?
14       A    I am now objecting to it.
15       Q    I said apart from the lawsuit.  I mean, back
16   then you didn't voice any concern about that, right?
17       A    I had concerns, but I'm not going to voice it
18   to superiors.
19       Q    Now, after January 31, 2000, and you've
20   already indicated that you never went back home to live
21   there?
22       A    That's correct.
23       Q    And you thereafter separated from your wife?
24       A    Yes, sir.
25       Q    And you ended up moving to reside in a new

Page 247

1   location?

2   A    Yes, sir.

3   Q    Now, as a result of anything that happened on
4   January 31, 2000, there wasn't any actual disciplinary
5   action of any kind that you experienced, true?

6   A    Documented disciplinary action, no, sir.
7   Undocumented, yes, sir.

8   Q    Well, we've already covered, and you've made
9   it very clear that in terms of the formal performance
10  evaluation system with the agency, you've received very
11  good evaluations every year?

12  A    Yes, sir.

13  Q    And you didn't lose any -- you didn't have any
14  monetary losses of any kind as a result of this
15  incident?

16  A    Not true.

17  Q    Well, in your position as master sergeant in
18  your assigned post, you didn't suffer any monetary
19  losses as a direct result of whatever happened on
20  January 31st?

21  A    Yes, I did.

22  Q    Well, isn't it true that even as we sit here
23  today, that you're probably one of the higher paid
24  troopers in the entire agency in terms of gross income
25  on an annual basis?

Page 276

1  that is his understanding, but that was indicated to me.
2              MR. JORDANO:  We'll take your
3  representation for that.  We need to find out the facts
4  before we go forward anyways.
5
6              CROSS-EXAMINATION BY MR. DOYLE
7
8       Q    I just have a few questions for you,
9  Mr. Waananen.  To your knowledge, other than in an
10 Enfield PD report that arose out of this incident, are
11 there any other reports in existence concerning the
12 incident that day?
13      A    The only other one that I know that exists,
14 because I signed off on some of them, was an overtime
15 report to pay the SWAT team members that had responded
16 to my residence.  The next morning I actually had to go
17 into my office and sign off and approve to give
18 authorization for the troopers from my troop that were
19 on the SWAT team that were at my residence that night.
20 However, there is no police reports, there is no
21 internal affairs investigation, there is no
22 documentation, there is no court paperwork, there is
23 nothing at all done on this thing, because it is a
24 major, major cover-up.
25      Q    As part of the normal policies and procedures

1  of the State Police in responding to a domestic dispute,
2  are there generally reports that are generated, and if
3  so, what are those reports?
4      A   It is required by state statute that a report
5  be generated regardless of whether an arrest was made or
6  not for any domestic dispute that comes to our
7  attention, none was done in this instance.  Then, if
8  somebody is arrested, then you would do police, you
9  would do processing paperwork, if items are seized as
10 they were in my case, you would do seizure paperwork, if
11 people are committed, you would do committal paperwork,
12 as was in my case.  No paperwork was done.
13         There are so many reports that should have
14 been generated, I would probably estimate 15 reports
15 that should have been generated by this thing.  It is
16 unheard of, and it has never happened before and it has
17 never happened since that the SWAT team has responded to
18 something and did not generate a report, this is the
19 only instance that this occurred.
20         It is unheard of that something of that
21 magnitude did not generate an internal affairs
22 investigation, it just doesn't happen.  We do it for the
23 most minutia things such as decorum on the telephone we
24 do internal affairs investigations and jam people up for
25 that.  This is a SWAT team surrounding a State Police

1  master sergeant's house involving the lieutenant colonel

2  and the State Police, at least two majors, and countless

3  others, involving a local police department, and no

4  documentation was done other than by the local police

5  department.

6        Q    What do you believe your economic damages have

7  been as a result of this incident?

8        A    There are so many. I had to pay out so much

9  more for my divorce because of this incident, because of

10 the allegations that I'm an unstable person, the

11 allegations that I am a threat to myself and to society.

12 My living arrangements, everything that I touched is

13 constantly tainted by this incident, and it never will

14 change until I'm eventually able to move away to an area

15 where nobody my names, and nobody knows the incident

16 that occurred here, so it is constant.

17           I have not been promoted because of this in my

18 opinion because of this incident. I took an examination

19 that I was not thoroughly prepared to take right after

20 this incident, and I failed it miserably, because my

21 mind was not on the matter at hand, and as a result, I

22 have not received a promotion for it, even though I am,

23 quote, unquote, a stellar master sergeant in the State

24 Police, and the damages are just staggering in my

25 estimation.

Page 279

1  MR. DOYLE: I have nothing further.
2  MR. COURTNEY: I have just some quick
3  recross here.
4
5  REDIRECT EXAMINATION BY MR. COURTNEY
6
7  Q  I had touched on it earlier, but isn't it true
8  that you are one of the highest paid master sergeants or
9  troopers in the state right now currently as a result of
10 total gross income including overtime pay?
11 A  I don't know where I fit in that, that is what
12 I said. I am at the top pay because of my seniority and
13 seniority in rank, yes, sir. There is nobody higher
14 than me as far as my gross pay.
15 Q  Well, you mentioned economic damages, and you
16 said something in regards to payments as a result of a
17 divorce, but I mean, first of all, it is true that
18 you're the one that, first of all, filed for the
19 divorce?
20 A  To see my children, absolutely, yes, sir.
21 Q  And secondly, the divorce was as a result of
22 an agreement?
23 A  Yes, sir.
24 Q  So whatever came out of the divorce was
25 something that you agreed to?

ORIGINAL

Page 286

```
 1                    CERTIFICATE OF DEPONENT

 2            I, Neal E. Waananen, do hereby certify
      that the foregoing testimony taken on February 13, 2004
 3    is true and accurate to the best of my knowledge and
      belief.
 4

 5    ___03/02/04___                    _Neal E Waananen_
 6         DATE                          Neal E. Waananen

 7          At __Troop C_____ in said County of

 8    __Tolland__, this __2nd__ day of __March__,

 9    2004, personally appeared Neal E. Waananen, and he made

10    oath to the truth of the foregoing answers by him

11    subscribed.

12

13

14    Before me _____, Notary Public.

15    My Commission expires: __7/31/05__

16

17

18

19

20

21

22

23

24

25
```

Page 287

1                    CERTIFICATE OF REPORTER

2      I, Robin L. Balletto, RPR, a Notary Public duly

3  commissioned and qualified in and for the State of

4  Connecticut, do hereby certify that pursuant to Notice,

5  there came before me, on the 13th day of February, 2004,

6  at 10:05 a.m., the following named person, to wit:

7  Neal E. Waananen, who was by me duly sworn to testify to

8  the truth and nothing but the truth; that he was

9  thereupon carefully examined upon his oath and his

10 examination reduced to writing under my supervision;

11 that this deposition is a true record of the testimony

12 given by the witness.

13     I further certify that I am neither attorney nor

14 counsel for, nor related to, nor employed by any of the

15 parties to the action in which this deposition is taken,

16 and further, that I am not a relative or employee of any

17 attorney or counsel employed by the parties hereto, or

18 financially interested in the action.

19

20     IN WITNESS THEREOF, I have hereunto set my hand and

21 affixed my seal this _16TH_ day of _FEBRUARY_,

22 2004,
                                    _Robin L. Balletto_
23                                  _____
                                    Robin L. Balletto
24                                  License No. 00230
                                    Notary Public
25 My Commission expires: 10/31/08