**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

Neal Waananen,                    :
     Plaintiff,               :
                              :
     v.                       :     No. 3:02cv2307 (JBA)
                              :
Timothy Barry et al.,             :
     Defendants.              :


**Ruling on Defendants' Motion for Summary Judgment [Doc. #30],**
**Defendants' Motion to Strike [Doc. #44],**
**and Plaintiff's Motion to Strike [Doc. #36]**

     This action pursuant to 28 U.S.C. § 1983 is brought by Neal
Waananen, a Master Sergeant at Connecticut State Police (CSP)
Troop D in Danielson, Connecticut, against four other CSP
supervisors in their individual capacities: Lieutenant Colonel
Timothy Barry; Eastern District Commander Major John Rearick;
Western District Commander Major Edward Lynch; and Master
Sergeant Sue Kumro, who was the commanding officer of the CSP
Employee Assistance Program.  Plaintiff alleges that defendants
violated his Fourth Amendment right against unreasonable search
and seizure and his Fourteenth Amendment rights to procedural and
substantive due process of law, by searching his house, seizing
firearms found therein, and forcing him to undergo a psychiatric
examination.  Defendants now bring a motion for summary judgment.
For the reasons that follow, defendants' motion is GRANTED.

**I.    Plaintiff's and Undisputed Facts**

The incidents complained of in this case arise from a
marital dispute between Plaintiff Neal Waananen and his now ex-
wife, Rosanne Waananen, in January 2000.  At that time, the
couple resided in Enfield, Connecticut, with their two children,
Erik (then 11 years old) and Audrey (then 6 years old).  The
marital discord began around Thanksgiving, 1999, and by January
2000 Waananen essentially was no longer speaking to his wife.

On Friday, January 28, 2000, Waananen had a regularly-
scheduled day off from work.  He had three appointments for that
day, but when he tried to use the family car to go to his first
doctor's appointment, Roseanne hid the keys from him.  In
retaliation, he disconnected some wires under the hood of the
family car, thinking that "if I couldn't use it, she wasn't going
to use my car either."  Waananen Depo. 88:23-24.  Waananen used
his police cruiser to get to his appointments.

Later that afternoon, Waananen heard over his police radio
that because of a water main break, his children's school was
closing early.  He drove to the school to pick up his children,
only to learn that Roseanne had already taken them home.  When
Waananen arrived home, he did not know where his family had gone.
He surmised that Roseanne and the children had gone to her
parents' house in Pittsfield, Massachusetts.

While Waananen was out, he received a page from a state

trooper named Terry McFadden.  McFadden alerted Waananen to the fact that a friend of his, John McGunigle, was urgently trying to contact him.  Waananen and McGunigle had been good friends since 1986, when they had lived in the same neighborhood.  They played golf together, attended sporting events with their children, and socialized with each others' families.  On January 28, 2000, Waananen did not return McGunigle's page.  He instead told Trooper McFadden that everything was fine with his family and that he would "take care of it."  Id. at 92:14-15.

When Waananen returned home at about noon that day, his sister, Laurel Slate, was waiting for him.  She told him they needed to talk, and Wannanen refused.  He told her to "Get out of my house," and then locked her out.  Id. at 94:10-11, 95:7.  At some point soon thereafter, McGunigle again contacted Troop D looking for Waananen.  The troop paged Waananen, and he told the troop again, "Don't worry.  I'll take care of it."  Id. at 97:15-16.  Waananen guessed that his wife must have contacted McGunigle asking for assistance, although it later turned out that his sister Laurel had made the call.  At about 1:00 pm, McGunigle came to Wannanen's house and insisted that they talk, saying that he thought he would find Wannanen "with [his] head blown off."  Id. at 99:14-15.  Waananen criticized his friend for alerting his troop to his marital difficulties, and insisted that McGunigle leave the house at that time, but they did make plans to spend that Sunday together to watch the Superbowl.

3

On the evening of Saturday, January 29, Roseanne called Waananen by telephone, but Waananen hung up on her.  During the day on Sunday, January 30, Waananen changed the lock to their kitchen door.  The lock needed repair, but Waananen was also afraid that when he left to watch the Superbowl his wife would take away all of their household possessions.  Also that day Roseanne sent him some type of certified letter, but he did not open it.  He left for Springfield, Massachusetts, where he and McGunigle watched the Superbowl at a sports bar and briefly discussed Waananen's marital difficulties.

The next morning, Monday, January 31, Waananen's family returned to the house at about 9:00 or 10:00 a.m.  Waananen had posted a note on the door, addressed to the children, stating that "your mother has told people that I'm homicidal or suicidal," that "she has run back to the bosom of her family," and was taking the children away from him.  Id. at 137:14-138:16. Waananen let his family into the house and gave Rosanne a key to the new kitchen door lock.  He exchanged angry words with his wife and tried to speak with his children, whom he described as "frightened, confused." Id. at 141:4.

After a few minutes, Rosanne took the children to school and remained there for the rest of the school day.  She noticed Waananen parked outside the school in his police cruiser.  At the end of the day she put the children in her car and Waananen followed them in his cruiser.  She drove around the town of

4

Enfield, eventually stopping in the parking lot of the Enfield
Police Department.  There, Waananen got out of his car and tried
to speak with the children.  After a while he and Rosanne agreed
they would return home, and they both drove back to their house.
When they arrived, Waananen ushered the children into the den
room, which he had converted into a bedroom for himself over the
weekend, and locked the door.

Rosanne called McGunigle on her cell phone.  While she was
speaking with him the phone went dead, so he called back on the
Waananen's home phone.  Waananen and Rosanne both answered.
Waananen heard McGunigle's voice and felt hurt, betrayed and
angry that McGunigle was "conspiring" with his wife.  Waananen
Depo. 163:18.  Over the phone he yelled at McGunigle that he
"better not show [his] face here," at their house, and then hung
up.  Id. 165:10-11.

McGunigle then went over to the Waananen's house, and
Rosanne let him inside.  McGunigle "pound[ed]" on the door of the
den, where Waananen was locked in with his children, telling the
plaintiff to open up the door.  Id. at 166:25.  Waananen
repeatedly shouted at McGunigle, through the door, to get out of
his house, and eventually opened up the den door, confronted
McGunigle, "picked him up by his overcoat collar, and ...
escorted him out of the house."  Id. at 168:7-8.  Throughout this
time, Rosanne was screaming at her husband not to hurt McGunigle
and at Erik and Audrey to run out of the house.  The children did

5

run away down the driveway, "crying hysterically," wearing only their socks.  Id. at 171:16.  On Waananen's orders Erik returned to the house but Audrey went to a neighbor's.  With his wife, daughter and friend outside, Waananen locked the kitchen door, which was their main entrance to the house.  Rosanne tried to unlock the door, but each time she unlocked it, Wannanen relocked it.  After this pattern repeated itself a number of times, Waananen moved the refrigerator to block the door, preventing Roseanne and McGunigle from reentering the house.  Waananen also stopped answering the home telephone, which McGunigle was calling from his cell phone.

McGunigle then called James Tilley, a state police trooper who had been a mutual friend of both McGunigle and Wannanen when the three of them played golf together.  Waananen stated that Tilley held a grudge against him stemming from a dispute over golf rules that had caused Tilley to lose a game.  McGunigle told Tilley that there was a problem between Waananen and his wife, and Waananen had barricaded himself and his son inside the house with a refrigerator.

Tilley paged Master Sergeant Sue Kumro, who was the coordinator of the Employee Assistance Program (EAP) of the Department of Public Safety.  The EAP is a "confidential counseling and support service for employees who have problems, including marital problems."  Pl. Interrogatories, ¶ 1.  Only an employee or his/her supervisor are supposed to make EAP

6

referrals.  Tilley was a subordinate of Waananen.  Nonetheless,
Tilley paged Kumro because he was close friends with her, and
"knew that she was friendly with Waananen and also that her job
was to assist DPS [Department of Public Safety] employees with
personal problems."  Tilley Aff. ¶ 5.  Kumro called Tilley back,
and Tilley informed her that Waananen had had an argument with
his wife, was acting irrationally, was barricaded in his house
with his son, and had physically pushed McGunigle out of the
house.  Tilley told Kumro that he had unsuccessfully tried to
reach Waananen by telephone.

Kumro called Waananen, repeatedly leaving messages on his
home answering machine.  Waananen did not listen to the messages
and did not know Kumro was trying to contact him.  When Kumro
could not get through to Waananen in person, she spoke with Major
Edward Lynch, Western District Commander of the State Police, who
happened to be with her attending a funeral for a state trooper.
Major Lynch called Lieutenant Eric Smith, who lived close to
Waananen's house in Enfield, and told him to go to the Waananen
house and attempt to stabilize the situation.  Major Lynch also
contacted Lieutenant Colonel Timothy Barry, who in turn indicated
he would contact Major John Rearick, Eastern District Commander
of the State Police and one of Waananen's supervisors.  Major
Rearick, in turn, called Lieutenant Thomas Davoren, Waananen's
direct supervisor.  Rearick instructed Davoren to go to
Waananen's house.

Lt. Smith arrived at Waananen's home first.  He interviewed McGunigle and Rosanne.  McGunigle told Smith that Waananen was acting irrationally, would not come out of his house, and had blocked the door with a refrigerator.  He also reported that Erik was inside the house with his father.  During this conversation, Rosanne Waananen gave Smith a key to the Waananen family residence.

Soon, officers from the Enfield Police Department arrived on the scene.  Shortly thereafter, Rearick, Davoren, and Sgt. William Konieczny also arrived.  In addition, Colonel Barry activated an emergency response "SWAT team," including a hostage negotiator, which mustered in a location not visible from the Waananen home.

When he arrived at the Pilgrim Circle neighborhood, Lt. Davoren tried to call Waananen on the home telephone line, but he could not get through because Waananen had disconnected the phone line in order to use it for internet access.  He and Erik were looking at pictures of dogs because Waananen was considering what type of dog to get his daughter, Audrey, for her birthday.  When Erik got hungry, Waananen disconnected the computer and ordered a pizza from Domino's.

Eventually Davoren paged Waananen, who responded and contacted Davoren by telephone sometime after 6:00 p.m.  At that point, Waananen surmised that his wife must have called the CSP to report their marital problems.  When reached by telephone,

8

Davoren asked if everything was okay, and Waananen responded that
it was a "family matter, ... a marital problem."  Waananen Depo.
at 186:21-22.  Davoren responded, "Well you know the deal, you
know the drill," and Waananen answered, "Yes, I do."  Id. at
186:22-24.  Davoren asked Waananen if he could come over and
Waananen agreed, stating, "Okay, stop on over," and offering
Davoren some of the pizza he had ordered.  Id. at 186:24-25.
Waananen testified that when Davoren mentioned "the drill,"
Waananen understood that term because he himself was a CSP
supervisor, and there were times that he "had to go over [to]
trooper's houses when there are allegations of marital discord,
... just to make sure everything is okay, and [Waananen] knew
that was what [Davoren] had to do as [his] superior... ."  Id. at
187:5-8.

Outside, Smith took the pizza from the deliveryman and,
accompanied by Davoren, approached the house.  At Rearick's
suggestion, Davoren put on a bulletproof vest.  When they got up
to the door, Waananen was surprised to see that the pizza
deliveryman was actually Lt. Smith, but he responded, "Come on
in," when Davoren asked, "How are you doing, do you mind if we
come in?"  Davoren and Smith observed that the telephone was on
the wall, the refrigerator appeared to be in place, and Erik
seemed to be fine.

Davoren and Smith asked Waananen about guns in the house.
Waananen stated that he kept his CSP-issued gun, unloaded and in

five separate pieces, in a closet in his den, and another gun
that he used when he was in plainclothes in the glovebox of his
car in the garage.  The officers secured both guns without
objection from Waananen.

At that point, Davoren informed Waananen that he would have
to go outside and speak to "the colonel," who turned out to be
Lt. Col. Barry.  Waananen understood that he was being ordered to
step outside.  When he began to leave, they said, "you better get
your coat," which he understood to mean that he was being taken
into custody.  Waananen Depo. 201:19.  Smith checked Waananen's
coat and person for weapons, at which point Erik became upset and
was screaming, "What is going on, where are you going?"  Id. at
203:9-10.  When the three men got outside the house, either Smith
or Davoren announced that everything was okay, and Waananen was
surprised to find a swarm of police officers outside on the
street.  At the end of the driveway, Rearick approached Waananen
and said, "Listen kid, you're not getting arrested, you're not
getting fired, just go with it."  Id. at 206:6-7.

Then Waananen had a discussion with Barry, who was outside
the house.  Barry informed Waananen, "You're going to the
Institute of Living," which is the psychiatric arm of Hartford
Hospital.  Id. at 216:12-13.  Waananen objected that he did not
need to go to the Institute of Living, and Barry responded,
"you're going."  Id. at 216:18.  Waananen asked, "Is that an
order, sir?" and Barry said, "Yes, it is."  Id. at 216:18-19.  At

first Barry ordered an ambulance, but then Davoren agreed to drive Waananen to the hospital, and this arrangement was accepted.

On the way to hospital, somebody (Waananen believes it was Barry) called Davoren on his cell phone and asked about more guns in Waananen's house.  Waananen responded that he had forgotten there was a .22 rifle in the closet in his master bedroom.  He had inherited it from his grandfather, and was keeping it for Erik, who was in the Boy Scouts.  The .22 rifle was then seized from the house after that discussion, and only returned by Major Rearick four days later.

At approximately 7:30 or 7:45 p.m., Davoren and Waananen arrived at the Hartford Hospital emergency room.  Three to five state troopers met them in the hospital parking lot.  At some point during the examination, Kumro, head of the EAP, arrived as well and spoke to Waananen briefly.  After interviews with medical and psychiatric personnel, Waananen was discharged.[1]

After he was released, Davoren drove Waananen back to his house on Pilgrim Circle.  He instructed Waananen to wait in the car while he gathered overnight things, and then Davoren took Waananen to a motel.  Waananen understood that Davoren, as his

---

[1]Waananen testified that upon discharge, the doctor told him, "You don't need a psychiatrist, you need a good divorce attorney."  Waananen Depo. 236:6-7.  Although plaintiff emphasizes this statement, it is inadmissible hearsay and the Court will not consider it.

superior, was forbidding him to return to his house.  Davoren suggested that Waananen stay with a friend or family member, but Waananen declined and chose a motel instead.  Davoren walked him in to the hotel and checked him in.  After that, Waananen never resided at the Pilgrim Circle house again.

Kumro, the head of the EAP, arranged for Waananen to see his children periodically by brokering a compromise with Rosanne. Waananen concedes that Kumro had no actual authority over child custody decisions, and was trying to be helpful, but asserts that Kumro was involving herself unreasonably in his family life and that he would have had more contact with his children had Kumro not become involved.

Waananen went to work the day after this incident--he did not miss any work--but in plain clothes and without his department-issued firearm.  Major Rearick returned Waananen's firearms approximately four days later.  Waananen did not suffer any negative performance evaluations, pay cuts, loss of promotions, or other career-related repercussions from this incident.  His only monetary claim is the cost of the evaluation at Hartford Hospital and subsequent psychological treatment with a private doctor, which terminated in April, 2000.  He also claims damages for humiliation and embarrassment.


**II.  Summary Judgment Standard**

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the non-moving party's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); accord Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) ("A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial.  It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'") (quoting Celotex, 477 U.S. at 324); Gallo v. Prudential Residential Servs., Ltd. Pshp., 22 F.3d 1219, 1223-1224 (2d Cir. 1994) ("the moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case") (citations omitted).

The non-moving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in his or her favor.  Anderson v. Liberty

13

Lobby, Inc., 477 U.S. 242, 249 (1986) ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party"); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.") (citation and internal quotation omitted).  In making this determination, the Court draws all reasonable inferences in the light most favorable to the party opposing the motion.  Id.  However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading," Fed. R. Civ. P. 56(e), and "some metaphysical doubt as to the material facts" is insufficient. Matsushita Elec., 475 U.S. at 586 (citations omitted).


## III. Discussion

### A.    Search and Seizure at Plaintiff's House

Defendants move for summary judgment on the grounds that plaintiff cannot establish a violation of his Fourth Amendment right against unreasonable searches and seizures[2] stemming from Davoren and Smith's entry into his home and their actions

---

[2]"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.

14

securing Waananen's firearms.  Warrantless entry into a home is
per se unreasonable, Payton v. New York, 445 U.S. 573, 586
(1980), absent consent or exigent circumstances.  Steagald v.
United States, 451 U.S. 204, 216 (1981).  Consent is a well-
established exception to the warrant requirement.  See United
States v. Yu-Leung, 910 F.2d 33, 41 (2d Cir. 1990), citing Bumper
v. North Carolina, 391 U.S. 543, 548 (1968).  Consent is valid
if, under the totality of the circumstances, the consent "was a
product of [the] individual's free and unconstrained choice,
rather than a mere acquiescence in a show of authority."  United
States v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995).[3]  "Consent can
be found from an individual's words, acts or conduct."  Krause v.
Penny, 837 F.2d 595, 597 (2d Cir. 1988).  The test is an
objective one: the court must determine whether a reasonable
police officer would believe that the subject consented to the
officer's entry into his home.  Garcia, 56 F.3d at 423.

     In this case, there is no factual dispute as to the actions
Rosanne and Neal Waananen took in admitting Connecticut State
Police personnel into their home.  Rosanne Waananen gave her
house keys to Lt. Smith and stated that "There is no question but
that I consented to DPS [Department of Public Safety] employees
entering the house."  Rosanne Waananen Aff. ¶ 27.  The test for

---

     [3]To the extent that plaintiff relies on United States v. Shaibu, 920
F.2d 1423, 1426 (9th Cir. 1990), to require a different standard of consent,
the Court notes that Shaibu was expressly disapproved as contrary to Second
Circuit precedent in Garcia, 56 F.3d at 424.

whether a third party validly consented to the entry of a home is, "Would the facts available to the officer at the moment ... 'warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?'" <u>Koch v. Brattleboro</u>, 287 F.3d 162, 167 (2d Cir. 2002), quoting <u>Illinois v. Rodriguez</u>, 497 U.S. 177, 188 (1990).  In this case, Rosanne resided in the house, possessed the keys to the house, and was married at the time to Waananen, who was barricaded in the house. A reasonable jury could only find that a reasonable officer would have believed that Rosanne had authority to consent to the entry of the officers under these undisputed facts.

Moreover, Waananen himself made statements that reasonably would be interpreted as consent for Davoren and Smith to enter his home.  When Davoren spoke with Waananen over the phone and asked if he could come over, and Waananen agreed and even invited him over for pizza.  When Davoren and Smith came to the door, Waananen opened it and said, "Come on in."  The officers, knowing that Waananen would at least have his duty firearm at home, asked about weapons, and Waananen freely stated that he had two handguns and described where they were located.  When questioned about the rifle on the way to the hospital, Waananen simply stated that he had forgotten about it because it was a gift from his grandfather and he did not use it.  He does not claim that he ever verbally objected to the seizure of his handguns or rifle. He does not claim that Davoren and Smith entered the house

16

without asking permission, or that he explicitly refused them entry.  Although Waananen may have preferred that his superiors at CSP did not come to his house or take away his guns, he points to no facts indicating that, at the time, he said or did anything that would have signaled to Davoren and Smith that they did not have permission to enter the house or to take his guns for safekeeping.  Thus, a reasonable officer would have interpreted Waananen's invitation to "Come on in," as exactly that.

Waananen claims that, although he did not actually refuse permission for the search or seizure, he felt he was not able to refuse because Davoren and Smith were his superiors at the State Police.  The question is whether, in the totality of the circumstances, Waananen's "will was overborne" by being confronted by Davoren and Smith, his superiors in rank, at his kitchen door.  Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973); see also United States v. Watson, 423 U.S. 411, 424 (1976), Garcia, 56 F.3d at 423.  The Supreme Court in Watson, 423 U.S. at 424, held that the fact that an individual was in custody, absent an overt show of force or coercion, did not make a consent to search involuntary.  The Second Circuit also suggested that consent could have been given voluntarily where a 20-year veteran police officer signed a consent form permitting DEA agents to search his home, despite the fact that the defendant was handcuffed, he had initially refused consent, and the six agents in his home would not allow him to contact his

attorney.  Yu-Leung, 910 F.2d at 41 (remanding to District Court
for evaluation of totality of circumstances).  None of these
potentially coercive factors was present in this case.  Waananen
was not threatened with arrest or any repercussions to his career
or his family; Davoren and Smith did not demand to enter the
house over objection or show up with weapons drawn.

Additionally, Davoren and Smith are not even named as
defendants in this action.  There is no evidence that any of the
four named defendants -- Rearick, Kumro, Barry or Lynch -- ever
entered or searched plaintiff's home.  In fact, plaintiff
testified twice that the "only two people that I know that
entered my residence of the State Police nature were then
Lieutenant Davoren and then Lieutenant Smith."  Waananen Depo.
230:8-11, see also id. at 228:20-22.  "Absent some personal
involvement by [defendants] in the allegedly unlawful conduct of
[their] subordinates, [defendants] cannot be held liable under
section 1983."  Gill v. Mooney, 824 F.2d 192, 196 (2d Cir. 1987);
see also Hernandez v. Keane, 341 F.3d 137, 144-45 (2d Cir.
2003).[4]  Plaintiff replies that police officers have an

---

[4]"The liability of a supervisor under § 1983 can be shown in one or more
of the following ways: (1) actual direct participation in the constitutional
violation, (2) failure to remedy a wrong after being informed through a report
or appeal, (3) creation of a policy or custom that sanctioned conduct
amounting to a constitutional violation, or allowing such a policy or custom
to continue, (4) grossly negligent supervision of subordinates who committed a
violation, or (5) failure to act on information indicating that
unconstitutional acts were occurring." Hernandez, 341 F.3d at 145.  Waananen
does not allege facts fitting any of these forms of supervisory liability
under § 1983.

affirmative duty to prevent other officers from violating a citizen's constitutional rights.  See O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988).  However, that duty only arises if the defendants actually witnessed other officers violate plaintiff's rights and had a "realistic opportunity" to prevent such violation.  Id.  Here, plaintiff admits that defendants were not even present inside his house when Davoren and Smith entered. Even if Barry and Rearick, who were present at the scene, could have intervened to stop the search or the seizure of the guns, O'Neill still requires plaintiff to prove an underlying violation of his constitutional rights, which he cannot do.

The Court finds no genuine dispute of any material fact related to the circumstances under which Davoren and Smith entered and searched plaintiff's house and seized his firearms, and that no reasonable juror could conclude under such circumstances that Waananen did not voluntarily consent. Therefore, no reasonable juror could find that defendants violated the Fourth Amendment with respect to their entering into his house and securing the guns.  Since no Fourth Amendment violation could be found, the Court does not reach defendants' claims of qualified immunity.

**B.  Psychiatric Evaluation**

Waananen also claims defendants violated his Fourth and Fourteenth Amendment rights, as well as Conn. Gen. Stat. § 17a-

19

503(a),[5] by transporting him to Hartford Hospital for a
psychiatric evaluation.

### 1.    Fourth Amendment Claim

"The Fourth Amendment requires an official to have probable
cause to believe that a person is dangerous to himself or others
before he can seize and detain such person for a psychiatric
evaluation." Glass v. Mayas, 984 F.2d 55, 58 (2d Cir. 1993).  In
this context, probable cause means "reasonable grounds for
believing that the person seized is dangerous to [him]self or to
others." Anthony v. City of New York, 339 F.3d 129, 137 (2d Cir.
2003) (internal citation and quotation marks omitted).  The
Fourth Amendment requires a "'probability or substantial chance'
of dangerous behavior, not an actual showing of such behavior."
Vallen v. Connelly, 2004 WL 555698, No. 99Civ.9947(SAS) (S.D.N.Y.
2004), quoting Monday v. Oullette, 118 F.3d 1099, 1102 (6th Cir.
1997); Hoffman v. County of Delaware, 41 F. Supp. 2d 195, 209
(N.D.N.Y. 1999).

While the Hartford Hospital evaluation concluded that
Waananen was not a danger to himself or others, the undisputed

---

[5]"Any police officer who has reasonable cause to believe that a person
has psychiatric disabilities and is dangerous to himself or herself or others
or gravely disabled, and in need of immediate care and treatment, may take
such person into custody and take or cause such person to be taken to a
general hospital for emergency examination under this section. The officer
shall execute a written request for emergency examination detailing the
circumstances under which the person was taken into custody, and such request
shall be left with the facility. The person shall be examined within
twenty-four hours and shall not be held for more than seventy-two hours unless
committed... ."  Conn. Gen. Stat. § 17a-503(a).

evidence shows that the facts available to the CSP defendants at
the time of the decision to require the evaluation indicated
probable cause to believe that Waananen potentially posed such a
danger.  Lt. Smith interviewed McGunigle and Rosanne Waananen
before going into the Waananen's house.  McGunigle told Smith
that Waananen was "'flipping out,' was irrational, would not come
out of his house, and ... had placed a refrigerator in front of a
door.  He stated that Waananen's wife and daughter had fled the
house.  He also reported that Waananen's son was in the house
with Waananen ... [and] that Waananen would not answer the
phone..."  Smith Aff. ¶ 5.  Smith knew that "Waananen would
likely have his duty firearm in his possession."  Id.  Before
Davoren arrived at the Waananen house, he was informed by Major
Rearick, his commanding officer, that "Waananen was barricaded in
his home and may be holding his son as a hostage."  Davoren Aff.
¶ 4.  When Davoren interviewed McGunigle and Rosanne, they told
him that "Waananen had seized his son, barricaded himself in his
house, moved a refrigerator in front of his door, and
disconnected the phone from a wall.  They reported that Waananen
and his wife had an argument and she said to him she was taking
the children, and that Waananen had said she was not taking their
young boy and he grabbed him."  Id. at ¶ 5.  Furthermore, Kumro
received information from Trooper Tilley, who had spoken with
McGunigle, that Wananen was having marital problems, "he was
reportedly barricaded in his house, [and] there was a child with

him..."  Kumro Aff. ¶ 10.  Kumro attempted unsuccessfully, two or
three times, to call Waananen by telephone, but only got his
answering machine.  Id. at ¶ 9.  While the reports from McGunigle
and Rosanne may have been somewhat exaggerated in tone, they were
in agreement, factually, with Waananen's version of events,
including his refusing to answer the phone, locking his wife out,
placing a refrigerator in front of the door, and throwing
McGunigle out of the house.  Therefore the state police had a
full picture of what had happened before they arrived on the
scene, which informed their later decisions.  As state police
supervisors, the defendants were also fully aware that Waananen,
also a state police supervisor, would probably have at least one
gun in his possession.

When Davoren and Smith entered Waananen's house, they found
Erik unharmed and Waananen apparently rational.  They found no
evidence of gun play.  After they all went outside, Lt. Col.
Barry believed that "Waananen appeared calm and the situation was
stabilized."  Barry Aff. at ¶ 9.  However, given the information
available to them from Rosanne and McGunigle about what had
occurred only a short time earlier that day,[6] they had probable
cause to believe that Waananen was potentially contemplating harm
to himself or his family.  The fact that Waananen had calmed down

---

[6]There is no evidence in the record that any of the defendants (or
Davoren or Smith) was aware of Waananen's actions earlier in the weekend, or
of the note he left for his wife on Monday morning that referenced being
"homicidal or suicidal."

when faced with two superior officers in his house does not
defeat the finding that there was probable cause at the time to
believe that, when left alone again with his family, Waananen
potentially posed a danger to them or to himself.

Waananen testified that he believed that Barry sent him to
the hospital to save face for ordering a police intervention that
turned out to be, in Waananen's view, unnecessary.  Waananen
testified that during his exchange with Barry on the driveway of
his home, "at one point Major Rearick who has no like for
Lieutenant Colonel Barry leaned in and jabbed him with a good
one, and said, Looks like you've been played, sir, and the
colonel was very upset with that, and he said, That remains to be
seen..."  Waananen Dep. 216:16-20.  Waananen further testified
that after he entered Lt. Davoren's car, he offered to let
Davoren handcuff him, but Davoren replied, "don't give this guy
[Barry] any more ideas."  Id. at 221:2.  Waananen appears to be
arguing that Barry somehow lacked probable cause because he may
have had a bad-faith motive.  However, "[s]ubjective intentions
play no role in ordinary, probable-cause Fourth Amendment
analysis."  Whren v. United States, 517 U.S. 806, 813 (1996).
Therefore Barry's motivation is not material to the Fourth
Amendment issue in this case.

The Court finds that there is no genuine dispute of material
fact concerning the decision to send Waananen for a psychiatric
evaluation, and based on the undisputed facts, no reasonable

23

juror could conclude that Barry did not have probable cause to send Waananen for the evaluation.  Defendants therefore must be granted summary judgment on this aspect of Waananen's Fourth Amendment claim.

### 2.    Fourteenth Amendment Claim

Waananen also claims that the mandatory psychiatric evaluation violated his Fourteenth Amendment due process rights. The Fourteenth Amendment framework is usually applied to involuntary civil commitment proceedings, and Waananen does not allege that he was subject to involuntary commitment proceedings, only that he was held for several hours for an evaluation.  Thus the Court believes that Waananen's claim is better analyzed under a Fourth Amendment framework as above.  However, to the extent that Waananen intends to claim that his involuntary evaluation was equivalent to an involuntary civil commitment, the Court will analyze it as such.

"An involuntary civil commitment is a massive curtailment of liberty, and it therefore cannot permissibly be accomplished without due process of law." Rodriquez v. City of New York, 72 F.3d 1051, 1061 (2d Cir. 1995).  A plaintiff's due process rights are measured by the applicable state standard governing civil commitments, see id. at 1062-63, in this case Conn. Gen. Stat. 17a-503(a).  That statute allows someone to be involuntarily transported to a general hospital for psychiatric evaluation, to

24

take place within 24 hours, if there is "reasonable cause to believe that a person has psychiatric disabilities and is dangerous to himself or herself or others... ." Conn. Gen. Stat. § 17a-503(a).  Thus, the statute sets a standard of "reasonable cause" before an involuntary evaluation is permissible. Likewise, the Fourteenth Amendment requires state officers to meet an objective standard of reasonableness before confining someone against his will for psychiatric treatment. <u>Glass</u>, 984 F.2d 57-58; <u>see</u> <u>also</u> <u>Williams v. Lopes</u>, 64 F. Supp. 2d 37, 42 (1999).

Whether an officer's actions were reasonable is a mixed question of law and fact; summary judgment is appropriate on this question only if there are no disputed issues of material fact. <u>Kerman v. City of New York</u>, 374 F.3d 93, 109 (2d Cir. 2004).

For the reasons set forth above, the Court has found, based on undisputed facts of which defendants were aware at the time they decided to transport Waananen to Hartford Hospital, that no reasonable juror could find that Barry lacked probable cause to believe that Waananen posed a potential danger to himself or others.  <u>Supra</u>, § III.B.1.  From this finding it necessarily follows that no reasonable juror could find that defendants lacked "reasonable cause" to believe that Waananen was "dangerous to himself or herself or others," under Conn. Gen. Stat. § 17a-503(a) or that defendants' actions were unreasonable under the Fourteenth Amendment Due Process Clause.  Thus defendants must be

granted summary judgment on the Fourteenth Amendment procedural due process claim.

### C.    Substantive Due Process Claim

Plaintiff's complaint raises a substantive due process claim under the Fourteenth Amendment.  Plaintiff has not, however, briefed the issue in his Opposition to Motion for Summary Judgment [Doc. #34], and the factual basis for this claim is unclear to the Court.  Thus the Court deems this claim abandoned.


## IV.  Conclusion

The Court finds that there are no material disputed issues of fact in this case, and the undisputed evidence shows that Waananen cannot establish that the defendants violated his Fourth or Fourteenth Amendment rights.  Accordingly, defendants' Motion for Summary Judgment [doc. #30] is GRANTED.

Defendants' Motion to Strike Certain Paragraphs from Plaintiff's Rule 56(a)(2) Statement [doc. #44] is DENIED AS MOOT. Plaintiff's Motion to Strike Summary Judgment Exhibits [doc. #36] is also DENIED AS MOOT because none of the challenged exhibits were relevant to the Court's decision on summary judgment.

The Clerk is directed to close this case.


IT IS SO ORDERED.

26

_____
JANET BOND ARTERTON, U.S.D.J.


**Dated at New Haven, Connecticut, this ___ day of November, 2004.**